METALLICS RECYCLING COMPANY, PETITIONER *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 21123–80.     Filed November 8, 1982.

*Arthur W. Moore* and *Robert W. Malone,* for the petitioner.
*Barbara B. McCaskill,* for the respondent.

SHIELDS, *Judge*: Respondent determined a deficiency of
$23,997.16 in petitioner's income tax for the year ending
December 31, 1977. Due to concessions, the sole issue for our
decision is whether petitioner is entitled to a new jobs tax
credit pursuant to sections 44B and 52(c).[1]

### FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation and
exhibits attached thereto are incorporated herein by this
reference.

Petitioner Metallics Recycling Co. (Metallics) is an Ohio
corporation. Its principal place of business was in Wooster,
Ohio, when it filed its petition herein.

Metallics is in the business of purchasing and processing
scrap metal and some scrap paper, and selling it to companies
for reuse. It was formed in 1975 by Samuel Shapiro, the
president and majority shareholder of Wayne Steel, Inc.
(Wayne), and by Robert Polsky, the president and sole share-

---

[1]All section references are to the Internal Revenue Code of 1954 as amended during the
years in issue.

holder of Volper Iron & Metal, Inc. (Volper). It purchased assets and inventory from Wayne and Volper in 1976 and 1977. It also hired former employees of Wayne and Volper in 1976.

To set forth clearly the facts concerning Metallics, Volper, and Wayne, we shall discuss each company separately.

### Wayne

Prior to 1977, Wayne carried on two distinct operations. It bought and sold scrap metal and it produced and sold new steel.

Wayne's scrap metal business involved both retail trade and industrial trade. The industrial trade consisted of purchasing large amounts of scrap metal from metal fabricators and processors. Wayne obtained this metal from huge haul boxes located on the fabricators' or processors' business premises.[2] Wayne then separated, baled, weighed, and resold the scrap metal. The retail trade involved purchasing scrap metal from individuals or small businesses who brought the scrap to Wayne's yard. Only a small portion of Wayne's scrap metal operation was comprised of retail trade.

Wayne did not have contracts with its suppliers under which they were obligated to deliver scrap metal to it. Instead, they supplied Wayne with scrap based largely on the price which Wayne offered. If they could receive a better price from another scrap metal company, they sold to that company. Wayne did have a yearly contract with one supplier, but even this contract was nonbinding and merely established the pricing scale which Wayne would use to purchase that supplier's scrap metal. Thus, Wayne obtained its supplies of industrial scrap metal on a month-to-month basis.[3]

After Wayne processed the scrap metal, it sold it to brokers who purchased the scrap for company accounts. There were only a "handful" of scrap metal brokers to which a scrap metal processor could sell its products. These brokers would contact Wayne on a month-to-month basis and would specify a price at

---

[2] During 1976, Wayne had huge haul boxes at 17 industrial customer locations.

[3] Of Wayne's 18 primary industrial sources of scrap metal during 1976, 12 were customers which had Wayne's huge haul boxes at their locations.

which they would purchase scrap. If the price desired was too high, the brokers would not buy from Wayne. Thus, Wayne's sales of processed scrap depended primarily upon whether the price at which it was willing to sell was equal to or lower than the price offered by the brokers.

The profitability of Wayne's scrap metal operations declined between 1974 and 1977. The gross sales and net profits attributable to Wayne's scrap metal operations for several years prior to the formation of Metallics were as follows:

| TYE Mar. 31— | Net profit before tax | Gross sales |
|---|---|---|
| 1974 | $311,526 | $1,704,810 |
| 1975 | 278,624 | 2,489,164 |
| 1976 | 27,991 | 1,349,048 |
| 1977 | 54,573 | 1,359,478 |

Wayne's total sales and net profits during those years were as follows:

| TYE Mar. 31— | Net profit before tax | Gross sales |
|---|---|---|
| 1974 | $546,151 | $5,292,789 |
| 1975 | 729,484 | 8,087,039 |
| 1976 | 384,962 | 5,627,410 |
| 1977 | [1]451,663 | 7,613,297 |

[1] Prior to sale of equipment to Metallics.

Thus, between 1974 and 1977, Wayne's pre-tax net profit on its scrap metal operations, measured as a percentage of its total pre-tax net profit, declined from 57 percent in 1974 to 12 percent in 1977.

Gary Plant, Wayne's former accountant and financial officer, and the other officers of Wayne were concerned about the decline in profitability of its scrap metal operations. In 1976, Mr. Plant felt that Wayne's scrap operation would become even less profitable unless new equipment was purchased. However, the new steel portion of Wayne's business had been increasing, and Wayne's management wanted to continue this expansion. Thus, Mr. Shapiro, Wayne's president and majority shareholder, indicated to Mr. Plant that he was

not interested in making new investments in Wayne's scrap metal processing operation in 1976.

## Volper

Prior to 1977, Volper was also in the business of buying and processing scrap metal and selling it for reuse. About 60 percent of Volper's scrap metal business was retail trade supplied by approximately 800 retail accounts. The remaining 40 percent of its business was in the industrial trade.

Volper had 48 lugger boxes which it supplied to 10 different industrial company locations during 1976. These companies were Volper's primary sources of industrial scrap metal for the years 1974 through 1976.

Customers sold scrap to Volper based on a competitive price. A significant factor in a dealer's obtaining scrap from suppliers was the competitiveness of its price with that of other dealers. The price at which a dealer, such as Volper, could sell its processed scrap depended upon the purchase price offered by the scrap metal brokers in the area.

Volper's gross sales and pre-tax net profit for several years prior to the formation of Metallics were as follows:

| TYE June 30— | Net profit before tax | Gross sales |
|---|---|---|
| 1974 | $214,738 | $2,102,314 |
| 1975 | 319,972 | 2,281,620 |
| 1976 | 203,098 | 1,529,090 |
| 1977 | [1]173,666 | 889,919 |

[1] $64,490 was gain on the sale of equipment to Metallics Recycling.

Thus, both Volper's gross sales and pre-tax net profits declined somewhat over a 4-year period. However, its pre-tax net profits, when measured as a percentage of gross sales, actually increased from 10.2 percent in 1974 to 19.5 percent in 1977.[4]

---

[4]We note that the 1977 profit figures take into account the sale of equipment to Metallics. This may have inflated the increase in net profits above the increase attributable to scrap processing. However, because we do not know whether the gross sales price includes the $77,850 of equipment sold to Metallics, we are unable to adjust the figures to discount the sale of such equipment.

## Metallics

To establish Metallics in 1975, Robert Polsky, the president and sole shareholder of Volper, contributed $190,000. Samuel Shapiro, the president and majority shareholder of Wayne, did likewise. Mr. Polsky and Mr. Shapiro each received 50 percent of Metallics' stock in return, valued at $100,000. Each also received a note payable in the amount of $90,000. Metallics actually began its scrap metal and paper operations in December 1976.[5]

At all times relevant herein, Mr. Shapiro was chairman of Metallics' board of directors and Mr. Polsky was Metallics' president. Mr. Polsky supervised the company's daily operations, while Mr. Shapiro served as a consultant. The two were constantly in contact concerning the business of Metallics. Gary Plant was Metallics' treasurer.

In 1976 and 1977, Metallics purchased machinery, equipment, and supplies from Wayne for $136,600. In 1977, it purchased additional equipment, machinery, and supplies from Volper for $77,850. It paid for these items with three cognovit promissory notes bearing $6\frac{1}{4}$-percent annual interest, and payable on demand 1 year after the notes were made. Metallics also purchased approximately $30,000 of scrap inventory from both Wayne and Volper during 1977. Subsequent to these sales, Wayne had remaining assets with a fair market value of $3 million, including inventory of $990,000. Volper had remaining assets with a fair market value of $994,000, including inventory of $319,000.

After the formation of Metallics, Volper and Wayne informed their customers that they would no longer be processing scrap. Wayne sent out an announcement to the effect that "the scrap division of Wayne Steel is no longer going to be, and we announced where we [Metallics] were going to be and how to get ahold of us probably if they wanted to continue." Moreover, when customers came with scrap to the yards of Wayne or Volper, they were advised of the existence of Metallics and its location.

Volper continued its retail scrap business on a reduced scale after 1976 until the lease on its property terminated. At the

---

[5]The record does not show whether Metallics entered the retail scrap business.

time of trial, Volper was in the business of buying and selling already-processed industrial scrap. It was also in the business of leasing automobiles and equipment. After the formation of Metallics, Wayne continued its scrap business until it had liquidated its remaining inventories.

Among the items of equipment that Metallics purchased from Wayne and Volper were 50 huge haul boxes (Wayne) and 48 lugger boxes (Volper). Metallics provided some of the huge haul boxes to 22 companies on location. Wayne had provided the boxes to 14 of those 22 companies. Metallics also provided lugger boxes to 25 companies on location. Volper had provided the boxes to 10 of these companies. Thus, 24 of the 47 company locations to which Metallics began providing scrap collection boxes had been customers of Wayne or Volper.

In addition to purchasing equipment, machinery, and inventory from Wayne and Volper, Metallics had buildings built and railroad siding installed. It also purchased additional equipment including a 60-foot scale. The railroad siding that Metallics had installed was larger and had a greater capacity than the siding which Wayne had used. Similarly, the scale was about 40 feet larger than the one which Wayne had used, and it could weigh trucks much more accurately. The cost of the buildings was approximately $350,000. The cost of the equipment was between $65,000 and $70,000.

Metallics hired some of its employees from Wayne and Volper in December 1976. Those companies had let go such of their employees who were involved in discontinued scrap metal operations. However, Wayne and Volper informed those individuals that Metallics had guaranteed a place for them at its place of business. Sixteen former Wayne employees and 10 former Volper employees joined Metallics.[6] Nineteen entered the same positions which they had held at Wayne or Volper. At the time of trial, 15 of these 26 employees still worked at Metallics.

Metallics also hired 29 additional employees during 1977. The wages paid in 1977 to these employees ranged from a low of $64.75 to a high of $7,152.99. The record does not show at what time during 1977 these employees joined the company.

---

[6]The record does not show the total number of employees originally engaged in the discontinued portions of Wayne's and Volper's scrap metal operations.

Three were summer employees, and one worked part time. At the time of trial, at least 14 of the employees no longer worked at Metallics.[7]

Metallics was successful in its operations during 1977. According to its 1977 income tax return, it had gross sales of approximately $3,317,034, total assets of approximately $1,464,746, and pre-tax gross profit of $784,993.[8] Of the 39 suppliers who provided Metallics with its primary sources of scrap during 1977, 27 formerly supplied scrap to Wayne or Volper. Of the 35 purchasers who bought more than $1,000 worth of scrap from Metallics during 1977, 20 formerly purchased scrap from Wayne or Volper. Metallics' income tax returns for 1977 also show that by the end of 1977, it had incurred short-term debt and accounts payable of $847,111 in addition to the $200,000 equity contributed and $180,000 debt advanced by Messrs. Shapiro and Polsky.

## OPINION

The Tax Reduction and Simplification Act of 1977, Pub. L. 95–30, 91 Stat. 126 (1977), was "designed to provide economic stimulus to increase consumer spending, expand production of goods and services and reduce unemployment."[9] To that end, the Congress enacted section 44B, which provided a new jobs tax credit to employers who satisfied certain requirements. In addition, the Congress concurrently enacted sections 51 and 52 which provided the methods of determining whether an employer was entitled to a credit and, if so, in what amount.[10]

Under the newly enacted sections, an employer which paid unemployment insurance wages in 1977, in an amount that exceeded 102 percent of the unemployment insurance wages it had paid in 1976, was entitled to a new jobs credit equal to 50 percent of the excess, subject to certain limitations. The amount of the credit was determined under section 51 by

---

[7]At least 5 still worked at Metallics. The record is unclear as to the remaining 10.

[8]This figure equals Metallics' gross receipts less its cost of goods sold. It does not include deductions for interest paid, repairs, officers' salaries, and the like. Metallics' pre-audit 1977 taxable income was reported as $200,603.

[9]H. Rept. 95–27 (Part 1) (1977), 1977–1 C.B. 501, 502.

[10]See secs. 44B, 51, and 52 prior to amendment by Pub. L. 95–600, sec. 321, 92–3 Stat. 2763 (1978).

comparing the current year's wages to those of the prior year. As a result, an employer which first began or expanded its operations in the current year was entitled to a credit because it paid minimal prior-year wages. However, section 52(c) limited this credit when the employer began or expanded operations merely by acquiring the business of another. The limitation provided that the wages paid in the preceding year by the prior employer would be attributed to the new employer for purposes of determining whether total unemployment insurance wages had actually increased in the current year. In particular, section 52(c) provided:

SEC. 52(c). ADJUSTMENTS FOR CERTAIN ACQUISITIONS, ETC.—Under regulations prescribed by the Secretary—

(1) ACQUISITIONS.—If, after December 31, 1975, an employer acquires the major portion of a trade or business of another person (hereinafter in this paragraph referred to as the "predecessor") or the major portion of a separate unit of a trade or business of a predecessor, then, for purposes of applying this subpart for any calendar year ending after such acquisition, the amount of unemployment insurance wages deemed paid by the employer during periods before such acquisition shall be increased by so much of such wages paid by the predecessor with respect to the acquired trade or business as is attributable to the portion of such trade or business acquired by the employer.

Respondent contends Metallics acquired a major portion of Volper's business and a major portion of a separate part of Wayne's business in late 1976 within the meaning of section 52(c). Thus, respondent reasons that Metallics is deemed to have paid such 1976 unemployment insurance wages as were paid by Wayne and Volper in 1976 and which were attributable to the portions of the business Metallics acquired from Wayne and Volper. Accordingly, respondent recomputed Metallics' new jobs credit by subtracting a portion of the unemployment insurance wages paid in 1976 by Wayne and Volper from Metallics' unemployment insurance wages paid in 1977. Respondent thereby determined that Metallics was not entitled to a new jobs credit in 1977 under sections 44B and 52(c).

## Singular versus Plural Construction

Petitioner Metallics argues that section 52(c) was not intended to apply to an employer which acquired a major portion of more than one business. It points out that section

52(c) is written in the singular number, and refers to the acquisition of *a* trade or *a* business from *an* other person. Moreover, it observes that the House and Senate reports relating to section 52(c) are also phrased in the singular number. Metallics contends that the clauses such as "*a* person who begins business in 1977 or 1978 by buying and operating *an* existing business"[11] (emphasis added), which appear in the legislative history of the new jobs tax credit, demonstrate that the Congress enacted section 52(c) primarily to prevent taxpayers from obtaining the credit merely by changing business form, without having created new jobs.

Respondent counters Metallics' argument by citing and quoting 1 U.S.C. sec. 1 (1976). This section of the U.S. Code is a rule of construction under which Federal statutes are to be interpreted. In pertinent part, it states: "In determining the meaning of any Act or resolution of Congress, words importing the singular number may extend and be applied to several persons or things; words importing the plural number may include the singular." From this rule of construction, respondent concludes that section 52(c) must be construed to encompass those employers which acquire more than one business and which seek a new jobs tax credit accordingly.

Title 1, section 1 of the U.S. Code does not support respondent's position. It does not state a mandatory rule of construction. Rather, it provides that use of the singular *may* apply to the plural as well. As the Supreme Court held in *First National Bank v. Missouri*, 263 U.S. 640, 657 (1924), "this rule [of 1 U.S.C. sec. 1] is not one to be applied except where it is necessary to carry out the evident intent of the statute." Thus, whether the rule of 1 U.S.C. sec. 1 is to be applied to section 52(c) depends upon congressional intent in enacting the new jobs credit generally, and section 52(c) particularly.

Congress enacted the new jobs credit to offset a portion of employers' costs of creating new jobs, with a view toward reducing unemployment. Discussing the reason for the credit, the Senate Finance Committee reports state:

The committee also believes that one of the most distressing features of our current economic situation is the high unemployment rate. The new jobs

---

[11]S. Rept. 95–66 (1977), 1977–1 C.B. 469, 490; H. Rept. 95–27, *supra* note 9.

tax credit is included in this bill because it addresses this problem directly. By limiting the credit to increases in employment, the committee believes it has provided a substantial incentive to hire new workers for a relatively modest revenue cost.

The clearly temporary nature of this provision is designed to make the employer's response an immediate one. Firms can take the opportunity to hire additional workers who can be employed to build up the inventories they desire to meet the increased sales induced by other parts of this bill. Firms with order backlogs, firms which may have deferred general maintenance activities because of the recession, and firms which may wish to increase the quality of their goods or services will have an incentive to add workers to their payrolls immediately. [S. Rept. 95–66 (1977), 1977–1 C.B. 469, 486.]

Similarly, the House report states:

The committee believes that the jobs tax credit, an important innovation in tax policy, will encourage increased employment in the next two years, especially among small businesses, thereby dealing directly with one of the nation's most serious economic and social problems. [H. Rept. 95–27 (Part 1) (1977), 1977–1 C.B. 501, 502–503.]

The Congress enacted a mechanical rule to implement the tax credit. Under section 51, the amount of credit was determined by comparing the unemployment insurance wages which an employer had paid in the prior year with the wages it paid in the current year. Although the rule was designed to be simple,[12] in certain instances, it enabled a credit to be computed even though no new jobs had been created. Both houses of Congress recognized the problem and observed:

If the amendment contained no explicit rules for the change in ownership of a business, a person who begins business in 1977 or 1978 by buying and operating an existing business would be entitled to a new jobs tax credit even if the number of employees in that business were not increased; the credit would be allowed because the buyer would not have paid unemployment insurance wages or total wages for the year before the business was acquired. Also, the sale of a unit of a business in 1977 or 1978 could cause the

---

[12]The Senate report provided:

"The new jobs tax credit reflects the considerable interest in Congress in establishing a tax incentive oriented toward new jobs, and it results in a program which can be easily administered by employers and the government. For the vast majority of businesses, this provision will require no additional recordkeeping, tracing of employees, or extensive searching through old records; they will use records already maintained in order to file required Federal Unemployment Tax Act (FUTA) returns. Thus, employers can easily understand their status with respect to this credit. In the interest of simplicity, no records of employee hours, no distinctions between part-time and full-time employees, and no tabulations of new employees are necessary. [S. Rept. 95–66, *supra* note 11, at 486.]"

seller to lose any new jobs tax credit even though employment increased in the part of the business that was retained. To solve these problems, the amendment includes special rules for computing the new jobs tax credit where a business changes hands.[13]

In short, the Congress intended to prevent the mechanical rule of section 51 from making available a credit to an employer which had just started business (and therefore which paid wages in the current year exceeding those it had paid the prior year), but which had not created any new jobs because it continued an existing business at the point another employer had left off. Thus, section 52(c) was one of the "special rules for computing the new jobs tax credit where a business changes hands" enacted to effectuate congressional intent to limit the credit when jobs had not been created.

The legislative history shows that the Congress intended the creation of jobs to be the touchstone for availability of the new jobs credit. Nowhere does the history indicate, as petitioner Metallics argues, that an employer's acquisition of the major portions of other employers' (plural) businesses falls outside the scope of section 52(c). Instead, the employer which acquires more businesses than one, but which hires no employees beyond those already involved in the acquired businesses, is precisely the employer which the Congress intended to preclude from receiving a new jobs tax credit.

We agree with petitioner that section 52(c) is phrased in the singular. However, the section does not contain language explicitly limiting its application to an employer's acquisition of only one business. In addition, the regulations discuss the requirements of section 52(c) in terms of *predecessor* employer and acquiring employer. Sec. 1.52–2(a), Income Tax Regs. This phraseology emphasizes that the prior existence of jobs, rather than continuity of employers, is the problem to which section 52(c) is addressed. Finally, the legislative history discusses the case of the independent contractor which "buys facilities and hires the employees of a taxpayer and then 'leases' them back to the taxpayer."[14] The legislative history specifies that the contractor is not entitled to a new jobs tax credit, because it

---

[13]S. Rept. 95–66, *supra* note 11, at 490–491. See also H. Rept. 95–27, *supra* note 9, at 515.
[14]H. Rept. 95–27, *supra* note 9, at 516.

has acquired the "major portion of a separate unit of the former employer's business." Thus, if section 52(c) applied only to singular acquisitions, as petitioner Metallics suggests, a contractor could buy facilities and hire employees of many more than one employer, then "lease" the employees and facilities back, thereby obtaining a new jobs tax credit despite the legislative history to the contrary. Such a result falls outside the evident intent of the Congress in enacting section 52(c).

In light of the legislative history, we find that 1 U.S.C. section 1, under which words of a singular number may be treated as if in the plural, is an appropriate rule of construction to apply to section 52(c). Accordingly, we hold that an employer which acquires the major portion of more than one trade or business is subject to the limitations of section 52(c).

## Major Portion of a Trade or Business

Petitioner Metallics presents the alternative argument that it did not acquire the major portion, or the major portion of a separate part, of Wayne's or of Volper's trade or business.[15] Metallics points out that the regulations under section 52(c) require that the assets, employees, etc., which an employer acquires from another employer, comprise a *viable* trade or business, not simply a collection of physical assets. Sec. 1.52–2(b)(1)(ii), Income Tax Regs. It asserts that, under section 52(c), a viable business means one in which goodwill has been transferred. It also contends that it did not acquire any goodwill from Volper or Wayne. Thus, Metallics concludes that it does not fit within the requirements, and therefore is not subject to the limitations, of section 52(c).

Respondent contends that Metallics did acquire the major portion of Volper's business and the major portion of a separate part of Wayne's business. He agrees with Metallics that under section 1.52–2(b)(1)(ii), Income Tax Regs., the portion transferred must be a viable trade or business for it to

---

[15]Metallics at times also makes the argument that it did not acquire a major portion of *its* trade or business from Wayne or Volper. This is an irrelevant contention. Sec. 52(c) inquires whether the taxpayer acquired "the major portion of a trade or business of another person," not whether the taxpayer acquired the major portion of *its* trade or business *from* another person.

be considered "the major portion of a trade or business." However, he contends that the transfer of goodwill in an acquisition is not a necessary condition for the acquisition to be of a major portion (or separate part) of a trade or business. Without discussing the meaning of "viable," respondent contends that Metallics acquired viable portions of Volper and Wayne. Thus, he asserts that Metallics acquired a major portion of Volper, and the major portion of a separate part of Wayne.

To decide whether the "major portion of a trade or business" has been acquired involves a qualitative and a quantitative inquiry. The quantitative inquiry examines the number, quality, and productivity or profitability of assets acquired. See sec. 1.52–2(b)(3), Income Tax Regs. The qualitative inquiry examines whether such assets comprise a viable business, not merely physical assets. As stated in the regulations, "Neither the major portion of a trade or business nor the major portion of a separate unit of a trade or business is acquired merely by acquiring physical assets. The acquisition must transfer a viable trade or business." Sec. 1.52–2(b)(1)(ii), Income Tax Regs. If these inquiries are satisfied, then an employer has acquired the "major portion" of a trade or business within the meaning of section 52.

With respect to the qualitative requirement, petitioner Metallics and respondent agree that when goodwill of a business is acquired, in addition to adequate and sufficient assets, a major portion of the business is acquired. Thus, we will first take up Metallics' contention that it did not acquire goodwill from either Wayne or Volper, and therefore could not have acquired a major portion (or separate part) of either company's business.

Goodwill has been characterized in a variety of ways. Frequently it is described as the "expectancy that 'old customers will resort to the old place' of business." See *Los Angeles Central Animal Hospital, Inc. v. Commissioner,* 68 T.C. 269, 273 (1977), and cases therein cited. Assets which have been viewed as commanding customer loyalty include familiar location, continued use of a trade name, and presence of neighborhood patronage. See, e.g., *Los Angeles Central Animal Hospital, Inc. v. Commissioner, supra* at 274; *VGS Corp. v.*

*Commissioner*, 68 T.C. 563, 590 (1977); *Rainier Brewing Co. v. Commissioner*, 7 T.C. 162, 176 (1946).

Metallics argues that Volper and Wayne had no goodwill to transfer, and therefore could not transfer goodwill to it. Metallics focuses on the testimony of Messrs. Polsky and Plant that scrap was purchased and sold based primarily upon price. According to Messrs. Polsky and Plant, customers had no contractual obligations to supply Volper or Wayne with scrap, and brokers had no obligation to purchase processed scrap from Volper or Wayne. Both customers and brokers would sell or buy scrap on a monthly basis, and their sales or purchases depended upon price. Metallics contends that when a market is controlled wholly by pricing, no goodwill exists.

We agree that a business depending solely on price competitiveness is not likely to have goodwill. As this Court has held "Where price is the prime competitive factor, little goodwill can be present." *VGS Corp. v. Commissioner, supra* at 590. However, we disagree with Metallics' contention that the scrap processing business was purely price competitive and devoid of goodwill. The stipulated facts show a very close relationship between Metallics' primary sources of industrial scrap during 1977 and Wayne's and Volper's combined primary sources of industrial scrap during 1974 to 1976. Twenty-eight companies were the primary suppliers of industrial scrap to Wayne and Volper prior to the formation of Metallics. After the formation of Metallics, 27 of the 28 companies became primary suppliers of industrial scrap to Metallics.

The facts also show a close relationship between the primary purchasers from Wayne and Volper and the primary purchasers from Metallics. Wayne and Volper had 22 primary scrap purchasers during 1974 to 1977. After the formation of Metallics, 20 of the 22 became primary purchasers from Metallics. In the absence of additional evidence to explain Metallics' ability to attract former customers of Wayne and Volper, we conclude that the scrap processing business was not purely price competitive and devoid of goodwill.

Metallics argues that whether or not Wayne or Volper possessed goodwill, none of their goodwill was transferred to it. Metallics claims that because it did not acquire its name, its land, or its building facilities from either Wayne or Volper, it could not have obtained their goodwill. Metallics further

asserts that the agreement between Volper, Wayne, and their respective presidents, under which Metallics was formed, explicitly states that Metallics did not acquire goodwill. We disagree.

First, we find that Metallics acquired the benefit of both Wayne's and Volper's locations. The stipulated facts show that Metallics was located approximately 2.5 miles from Wayne's main operation and 5 miles from Volper's operations. It is probable that Metallics did not acquire locational goodwill by the placement of its scrap yard.[16] However, Metallics did acquire huge haul boxes from Wayne, and lugger boxes from Volper. Wayne had huge haul boxes *on location* with 17 companies in 1976. During 1977, Metallics placed huge haul boxes at 16 of the 17 companies where Wayne had its boxes. Volper had lugger boxes *on location* with 10 companies during 1976. During 1977, Metallics placed lugger boxes on location at all 10 of these companies. From these facts, it is apparent that Metallics gained locational goodwill from Wayne and Volper because it was able to place scrap collection boxes at almost all of the locations where Wayne and Volper had placed such boxes.

Second, Metallics gained a collection of established customers from Wayne and Volper. After the formation of Metallics, employees at the scrap yards of both Wayne and Volper told customers who had driven up with materials Metallics was accepting scrap, even though their yards were not. In addition, Wayne sent out announcements to its usual customers[17] informing them that Metallics had been formed and was entering the scrap processing business. As discussed above, after the formation of Metallics, most of Wayne's and Volper's suppliers and purchasers commenced selling to and purchasing from Metallics. These facts indicate that Metallics received goodwill from Wayne and Volper in the form of established customers.

---

[16]We note, however, that 5 miles may be a short distance in the scrap processing business. While a city business district may only encompass a few square blocks, and thus locational goodwill may only exist within that area, it is conceivable that a manufacturing district may encompass a number of square miles. The facts in this case do not show which situation is more realistic.

[17]Mr. Polsky does not recall whether Volper sent out announcements.

Finally, Metallics' argument that it did not acquire goodwill from Wayne and Volper, because the agreement under which it was formed shows that no goodwill was transferred, is not persuasive. The relevant language of the agreement reads as follows:

VII. *Good Will, Etc.* The books of Metallics Co., will not, upon contribution of initial capital thereto, reflect any values for goodwill, trade names, trade marks, or other intangibles.

First, this language relates to the initial contribution of capital to Metallics. It does not pertain to Metallics' purchase, from Wayne and Volper, of equipment, machinery, and inventory. Second, the language does not state that Metallics did not acquire goodwill or other intangibles. The agreement only provides that the "books of Metallics Co., will not * * * *reflect* any values" (emphasis added) for such property. From the language of the agreement, we are unable to conclude that Metallics did not receive goodwill from Wayne or Volper.

We find that Metallics acquired goodwill from Volper and Wayne along with the equipment, machinery, and inventory it acquired. Thus, we do not need to examine respondent's assertion that a business can be viable within the meaning of section 1.52–2, Income Tax Regs., whether or not goodwill was transferred with the portion acquired—an issue which we expressly do not decide. However, we must examine whether the assets acquired by Metallics from Wayne and Volper satisfy the other statutory requirements of section 52(c) and comprise "the major portion of a trade or business * * * or the major portion of a separate unit of a trade or business of a predecessor."

The regulations under section 52 specify that whether a taxpayer has acquired the major portion of a trade or business is determined by consideration of all the facts and circumstances. They state that factors to be considered include:

(i) The fair market value of the assets in the portion relative to the fair market value of the other assets of the trade or business (or separate unit);

(ii) The proportion of goodwill attributable to the portion of the trade or business (or separate unit);

(iii) The proportion of the number of employees of the trade or business (or separate unit) attributable to the portion in the periods immediately preceding the transaction; and

(iv) The proportion of the sales or gross receipts, net income, and budget

of the trade or business (or separate unit) attributable to the portion. [Sec. 1.52–2(b)(3), Income Tax Regs.]

The use of this facts-and-circumstances test also determines whether a taxpayer has acquired the major portion of a separate part of a trade or business. In addition, with respect to the transfer of a separate part, the regulations provide:

(i) A separate unit is a segment of a trade or business capable of operating as a self-sustaining enterprise with minor adjustments. The allocation of a portion of the goodwill of a trade or business to one of its segments is a strong indication that that segment is a separate unit. [Sec. 1.52–2(b)(2), Income Tax Regs.]

The regulations also contain eight examples as illustrations of the acquisition of a separate part.

Turning to the first factor listed in the regulations, petitioner Metallics contends that the fair market value of the assets it purchased from Volper and Wayne was a small fraction of the fair market value of assets remaining with Wayne and Volper. Metallics asserts that this shows that it did not acquire a major portion of either Wayne or Volper. Respondent concedes that Wayne sold assets having a fair market value of only 7 percent of Wayne's total assets. He also concedes that Volper sold assets having a fair market value of 12 percent of its total assets. Accordingly, this factor indicates that Metallics did not acquire a major portion (or separate part) of Wayne and Volper.

The second factor listed in the regulations concerns the portion of goodwill acquired. As discussed above, Metallics insists that it could not and did not acquire goodwill from Wayne or Volper. However, we have held that Metallics acquired goodwill from Wayne and Volper. Thus, we must consider whether it received a sizable portion of their total goodwill.

Respondent argues that Metallics acquired all of the goodwill associated with Wayne's scrap processing business. First, he asserts that Metallics acquired the business of almost all of Wayne's suppliers and purchasers. Second, he asserts that Wayne discontinued its scrap business entirely, and concentrated its attentions on its new steel business. Since the parties stipulated to these facts, we agree that Metallics acquired most of the goodwill associated with Wayne's scrap processing

business. Thus, this factor suggests that Metallics acquired the major portion of a separate part of Wayne.

Respondent next contends that Metallics acquired all of Volper's goodwill. He asserts that Volper continued its scrap business after the formation of Metallics only by intermittent purchases undertaken as the "personal endeavor" of Mr. Polsky, Volper's president. The stipulated facts show that Metallics acquired almost all of Volper's industrial suppliers and purchasers. However, Volper's scrap business was only 40 percent in the industrial trade. The remaining 60 percent of Volper's scrap business was retail trade, which Volper continued on a reduced scale after Metallics was formed. The record shows that Mr. Polsky's forays into the scrap business were not personal, but were undertaken in his role as Volper's president. Since the facts do not show that Metallics entered the retail trade, we find that Metallics acquired such of Volper's goodwill as was associated with Volper's industrial trade. Thus, we conclude that Metallics acquired 40 percent of the total goodwill associated with Volper's scrap business. This factor suggests that Metallics acquired a major portion of Volper's trade or business.

Looking to the third factor listed in the regulations, respondent asserts that a large proportion of the employees of Wayne and Volper were attributable to the portions transferred to Metallics. We agree. The stipulated facts state that 35 percent of Wayne's employees were involved in the scrap metal portion of its business prior to the formation of Metallics. They further state that approximately 77 percent of Volper's employees were involved in the portion of its scrap metal business which was subsequently discontinued. This fact also suggests that Metallics acquired a major portion (or separate unit) of both Wayne's and Volper's businesses.

Lastly, respondent argues that the proportion of Wayne's and Volper's gross receipts and net income attributable to the portions acquired by Metallics were major portions. He notes that, for Wayne's taxable year ending March 31, 1974, the scrap metal portion of Wayne's business accounted for 32 percent of gross sales and 57 percent of net profit. However, for Wayne's taxable year ending March 31, 1977, these figures were 18 percent of gross sales and 12 percent of net profit. Metallics acquired its portion of Wayne during the taxable

year ending March 31, 1977. Thus, at that time, Wayne's scrap metal sales and profits comprised a relatively small proportion of its total sales and profits. Nonetheless, it was not insignificant or a de minimis proportion. Because this factor weighs in both directions, it does not help resolve whether Metallics acquired the major portion of a separate part of Wayne.

Respondent determined that 100 percent of Volper's gross sales and net profits were allocable to the portion of Volper acquired by Metallics. Petitioner Metallics does not suggest an alternative allocation. However, we observe that 60 percent of Volper's business was in retail trade, which Metallics did not acquire. Similarly, we note that 77 percent of Volper's employees had been involved in the discontinued portion of Volper's business. We conclude that less than 100 percent of Volper's gross sales and net profits were attributable to the portion acquired in 1976 and 1977 by Metallics. However, in the absence of any other allocation suggested by petitioner or respondent, we find that 77 percent of Volper's business was derived from the industrial trade. See *Cohan v. Commissioner*, 39 F.2d 540 (2d Cir. 1930) (concerning approximation of amounts where some allocation is proper). This factor suggests that Metallics acquired a major portion of Volper's business.

Petitioner Metallics contends that, apart from the factors listed in the regulations, we must consider whether Metallics acquired from either Volper or Wayne a self-sustaining enterprise capable of operating with only minor adjustments. Metallics notes that, for Metallics to acquire a "separate part" of Wayne, this requirement must be satisfied under section 1.52–2(b)(2), Income Tax Regs. Metallics also asserts that this factor is relevant in determining whether it acquired a major portion of Volper.

We agree that the absence of major adjustments to acquired assets suggests that the major portion of a trade or business or the major portion of a separate part of a trade or business has been acquired. It is reasonable that the portion of a business acquired would more likely constitute the major portion of that business if it was capable of operating as a self-sustaining business after only minor adjustments.

Metallics asserts that it supplied major adjustments to the combined assets it obtained from Wayne and Volper to make these assets into one self-sustaining enterprise. For support,

Metallics looks to its 1977 income tax return, Schedule L, wherein it reported yearend assets of $1,464,746. Metallics contends that $274,450 of this sum was paid to Wayne and Volper for machinery, equipment, and inventory. Thus, Metallics contends that it invested $1,190,296 in its scrap processing business to make the $274,450 in assets which it acquired from Volper into a single, self-sustaining operation.

Schedule L does not support petitioner Metallics' argument. Schedule L merely lists Metallics' yearend assets. It does not show what adjustments were necessary to make the portion Metallics acquired from Wayne into a self-sustaining operation. Nor does it show what adjustments were necessary to make the portion acquired from Volper self-sustaining. However, Schedule L does show that $860,070 of Metallics' yearend asset value was attributable to cash, trade notes and accounts receivable, and inventory. Metallics does not explain how assets such as these could make physical assets self-sustaining.[18] A more reasonable inference is that the accounts receivable and a portion of the cash were generated by operation of the physical assets. In the absence of additional evidence, we find that Metallics has failed to show that the amount of $860,070 comprised major adjustments to the portions Metallics received from Wayne and Volper necessary to make them self-sustaining.[19]

Petitioner Metallics next contends that it spent at least $380,000 on land, buildings, railroad siding, a scale, and other assets in addition to the $274,450 which it paid to Wayne and Volper for their assets. It contends this amount was spent on adjustments necessary to convert the portions of Wayne and Volper into self-sustaining operations. Respondent concedes that Metallics received $381,000 from Messrs. Shapiro and Polsky and invested that amount in its business. However, respondent protests that the moneys were spent on expansion of an existing business. He contends that only a small fraction of the $381,000 was expended for purposes of making the acquired portions of Wayne and Volper self-sustaining. Ac-

---

[18]Metallics initially acquired approximately $60,000 in inventory from Wayne and Volper.

[19]We do not hold that additions of cash, accounts receivable, or inventory may never be adjustments necessary to make a business self-sustaining.

cordingly, he concludes that the adjustments were not major adjustments.

The facts are unclear as to how the $381,000 was expended. The testimony of Mr. Plant suggests that it was spent upon land, buildings, a guillotine shear for cutting scrap, railroad siding, and a 60-foot scale and scale pit for weighing truckloads of scrap. However, subsequent testimony shows that Volper purchased the guillotine shear after 1977. Similarly, the column pertaining to land value in Schedule L of Metallics' 1977 Federal income tax form was left blank.

The facts are also unclear as to which of the assets acquired by Metallics were necessary to transform the acquired portions of Wayne and Volper into self-sustaining operations. Evidently, a railroad siding was not a necessary purchase because Volper did not have a railroad siding. We are also unable to find that a scale for weighing trucks was necessary because the evidence does not show whether Volper had a scale in its business.[20] While it seems reasonable to find that a scrap business needs some sort of a scrap yard, the record is silent as to the portion of the $381,000, if any, which Metallics expended on land. Similarly, it is reasonable that a scrap processing business might use some kind of warehouse. Again, the record is silent as to the type of buildings which Metallics constructed, except for a truck- and equipment-maintenance facility. Neither Wayne nor Volper had such a facility, so we cannot conclude that it was necessary in the scrap processing business.

On the record before us, petitioner Metallics failed to show that it made major adjustments to its acquired portions of Wayne and Volper to make them self-sustaining. To the contrary, such facts as exist suggest that Metallics acquired self-sustaining operations from both Wayne and Volper, then made additional investments to expand its newly acquired business. The conclusion that Metallics acquired a major portion (or separate part) of Wayne's or Volper's business is bolstered by the fact that Metallics acquired goodwill from Wayne and Volper. As stated in the regulations concerning the meaning of a separate part, "the allocation of a portion of

---

[20]Wayne did have a scale which Mr. Plant considered inadequate for scrap processing.

the goodwill * * * is a strong indication that that segment is a separate unit." Sec. 1.52–2(b)(2), Income Tax Regs. Moreover, the proportion of goodwill Metallics acquired was substantially all of the goodwill which Wayne had associated with its scrap business, and which Volper had associated with its industrial trade business. Thus, we find that Metallics acquired the major portion of a separate part of Wayne and the major portion of Volper.

To determine whether Metallics is entitled to a new jobs tax credit, Metallics must be attributed with the 1976 unemployment insurance wages Volper paid to the 77 percent of its employees who worked in the acquired portion of its business. Similarly, Metallics must be attributed with the 1976 unemployment insurance wages Wayne paid to the 35 percent of its employees who worked in the acquired portion of its business. Therefore, to the extent that this computation under section 52(c) reduces the new jobs tax credit claimed by petitioner Metallics, we find that Metallics is liable for the deficiency determined by respondent.

In order to give the parties the opportunity to make adjustments,

*Decision will be entered under Rule 155.*