OPINION. ARundell, Judge: The principal question in this case concerns the tax treatment of the proceeds from the sale of the assets of a partnership. The petitioners were equal partners in the vendor partnership and were also the only stockholders in the purchasing corporation. Bespondent does not question the separate entities of the parties to the sale nor does he contest the fact that a sale has taken place. He agrees that the valuation placed upon the tangible assets of the partnership was reasonable and that gains on the sale of the tangibles are properly treated as capital gains. The deficiency is founded essentially in respondent’s contention that the partnership had absolutely no goodwill or other intangible assets and that the provision in the contract of sale for the payment of $100,000 by the corporation to the partners for goodwill and other intangible assets was nothing more than a disguised dividend to shareholders, a subterfuge designed to permit the taxation of ordinary income at capital gains rates. We think it clear that the partnership did own and transfer goodwill of substantial value. The partnership had assembled and trained a group of highly skilled employees accustomed to working together. Specially designed equipment had been developed for the particular work done by the partnership. A distinct pattern of growth had been established despite the mere 28 months of operation, and the partnership from its very inception showed substantial and constantly increasing profits far beyond what might be expected as a normal return on the investment in tangibles. The $100,000 valuation placed on goodwill by petitioners is based essentially on capitalization of those “excess earnings.” In the case at bar, the earnings of the partnership were derived in large measure from customers who had previously been and were customers of Ad Press. The record shows that when Arthur and Sidney contacted the regular customers of Ad Press they also solicited business for the partnership. Moreover, Sidney viewed the photo-offset process from the start as a more advantageous method .of performing certain types of work previously done only by the letterpress method employed by Ad Press. It would seem that at least a part of the work done by the partnership would normally have been done by the corporation if it had not been diverted to the partnership by Sidney and Arthur. This is borne out by the fact that offset printing subsequently accounted for about 90 per cent of the business of Ad Press. We are convinced that the corporation would not have been willing to pay an unrelated third person for the expectation of that part of the business that would presumably have come to it in any event and, for that reason, we think a goodwill valuation based on capitalization of partnership earnings largely arising from such business is distorted. We cannot determine, of course, exactly how large a part of the partnership business was diverted from the corporation. We do know that the larger part of the business came directly or indirectly from or through Ad Press. Of the total billings of $253,791.02 to customers during the life of the partnership, the stipulation shows that $194,054.90 was billed through Ad Press for business involving both offset and letterpress work. The balance of $59,736.12 was billed by Legal Offset directly to 39 customers, 18 of whom had not done business with Ad Press prior to the organization of Legal Offset. Of the $59,736.12 billed directly by the partnership, $31,671.65 was to the 18 new customers. Taking into consideration all of these facts and circumstances, we cannot agree that the goodwill of the partnership at the time of the sale of the offset business to Ad Press had a value as high as $100,000. •As we have heretofore stated in this opinion, we think the partnership had a substantial goodwill. We have carefully studied the record and have taken into consideration the various factors bearing on goodwill and, after making a reasonable allowance for salaries and giving due weight to the source of the partnership clientele, we have concluded that Legal Offset owned and transferred to Ad Press intangibles of the value of $45,000. It follows that the profit on the sale of partnership assets and the sums found to be distributed to Arthur and Sidney should be recomputed accordingly. George J. Staab, 20 T. C. 834, is clearly distinguishable. There the vendor partnership was engaged in the manufacture of molds and dies of the type used by the purchasing corporation in its plastic business. There was no element of duplication of customer lists. As to the penalties for failure to pay estimated tax, petitioners assert initially that since they had no funds available at the time payment became due,, the failure to pay was due to reasonable cause and not to willful neglect. We find no merit in this contention. Cf. Rene B. Bouche, 18 T. C. 144. An additional question is presented as to the amount of the penalty. Section 294 (d) (1) (B) of the Internal Revenue Code of 1939 provides as follows: SEC. 294. ADDITIONS TO THE TAX IN CASE OF NONPAYMENT. (d) Estimated Tax.— (1) Failure to vile declaration or pax installment op estimated tax.— ******* (B) Failure to Pay Installments of Estimated Tax Declared. — Where a declaration of estimated tax has been made and filed within the time prescribed, or where a declaration of estimated tax has been made and filed after the time prescribed and the Commissioner has found that failure to make and file such declaration within the time prescribed was due to reasonable cause and not to willful neglect, in the case of a failure to pay an installment of the estimated tax within the time prescribed, unless such failure is shown to the satisfaction of the Commissioner to be due to reasonable cause and not to willful neglect, there shall be added to the tax 5 per centum of the unpaid amount of such installment, and in addition 1 per centum of such unpaid amount for each month (except the first) or fraction thereof during which such amount remains unpaid. In no event shall the aggregate addition to the tax under this subparagraph with respect to any installment due but unpaid, exceed 10 per centum of the unpaid portion of such installment. Respondent concedes, on brief, that the penalty begins to run only from the date of the amended estimate, January 15, 1951. It is his contention, however, that the maximum penalty of 10 per cent is payable. Petitioners take the position that even though some penalty may be due, the accretion of the 1 per cent increments was terminated by the filing of their final income tax returns on March 15, 1951, notwithstanding the fact that the bulk of the taxes remained unpaid thereafter. They argue that the penalty, if any, is limited to 6 per cent of the unpaid amount consisting of 5 per cent for the period from January 15 to February 15, 1951, and an additional 1 per cent from that date to March 15,1951. The identical question was before us in Carl M. Stephan, 16 T. C. 1157, in which we held that the filing of the final return did not prevent the accretion of the additional 1 per cent increments to the penalty for failure to pay estimated tax. The Court of Appeals for the Fifth Circuit reversed our decision, sub nom. Stephan v. Commissioner, 197 F. 2d 712. After carefully reviewing the opinions and further study of the question, we think that the correct rule was stated by the Court of Appeals. We agree with the Court of Appeals that the word “unpaid,” as it appears in section 294 (d) (1) (B) should be construed as “due but unpaid” and that with the making of the final return, what is due and unpaid is the entire unpaid tax as is shown by the return and not an installment of an estimated tax.[3] This construction is in harmony with the general pattern of the statute. Section 294 (a) (1) specifically provides that where the amount determined by the taxpayer as the tax imposed is not paid on or before the date prescribed for its payment, there shall be collected as part of the tax interest upon such unpaid amount at the rate of 6 per cent per annum from the date prescribed for its payment until it is paid. If the estimates -were accurately made, any tax unpaid at the time the final return is filed would alrrays include some part or all of an unpaid installment. If Congress had intended the two additions to tax to run concurrently, we think it would have made it plain. It is interesting to note that in the 1954 Code it is provided that the penalty of 1 per cent per month imposed by section 294 (d) (1) (B) runs not later than the date for making the final return. It follows that in the case at bar, the penalty under section 294 (d) (1) (B) must be limited to 6 per centum of the unpaid balance. Our opinion in Carl M. Stephan, supra, will no longer be followed. Reviewed by the Court. Decisions will he entered under Rule 50. Judge Rives of the Court of Appeal stated : “Section 294(d)(1)(B), like other penal statutes, is to be interpreted liberally in favor of the taxpayer and strictly against the Government. See 50 Am. Jur., Statutes, Section 407, et. seq. We can see no reason why the word ‘unpaid’ as used in subparagraph (B) should be given any different construction than the words ‘due but unpaid’ used throughout the preceding subparagraph A and also in the final sentence of subparagraph (B). To say that an installment of the estimated tax remains unpaid presupposes a continuing duty to pay such installment. The declaration of estimated tax had served its function when the final return was filed. There was then no longer any uncertainty, and the tax should thereafter be paid on the basis of the final return rather than as estimated. It follows that installments of the estimated tax were then no longer due.”