SOLITRON DEVICES, INC., PETITIONER v. COMMISSIONER OF
INTERNAL REVENUE, RESPONDENT

Docket No. 8313–78.    Filed January 10, 1983.

1

*John Y. Taggart* and *M. Jack Duksin*, for the petitioner.
*David M. Kirsch*, for the respondent.

STERRETT, *Judge*: By notice of deficiency dated April 20, 1978, respondent determined a deficiency in petitioner's Federal income tax for the taxable year ended February 28, 1970, in the amount of $981,762. The issues for decision are (1) whether petitioner purchased certain intangible assets previously held by General RF Fittings, Inc. (hereinafter GRFF), upon its acquisition of the stock of GRFF or whether petitioner created such intangible assets in itself by such acquisition; (2) whether, upon liquidation of GRFF, petitioner received such intangible assets to which it must allocate the attributable portion of its basis in the GRFF stock; (3) whether petitioner transferred all assets received upon the liquidation of GRFF, including the intangible assets, to a preexisting subsidiary, Integronics, Inc. (hereinafter New GRFF); (4) assuming that the intangible assets are found to have belonged to New GRFF, whether the assets of New GRFF were transferred to petitioner at any time prior to March 1, 1971; and (5) if it is found that petitioner owned the intangible assets during the fiscal year ended February 28, 1971, whether petitioner abandoned such assets during the fiscal year ended February 28, 1971.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference.

Petitioner Solitron Devices, Inc., was at all times material herein a New York corporation having its principal place of business in Tappan, N.Y. Petitioner's principal place of business at the time of filing the petition herein was Riviera Beach, Fla. The returns for the taxable years ended February 28, 1970, and February 28, 1971, were filed timely with the Internal Revenue Service Center, Andover, Mass. Petitioner did not file consolidated income tax returns with its subsidiaries at any time prior to its taxable year beginning March 1, 1970. Petitioner filed a consolidated income tax return for its taxable year ended February 28, 1971.

At all times material herein, petitioner was engaged in the business of designing, manufacturing, and marketing electronic components, including semiconductor devices. Petitioner was very successful in this business, having experienced a growth of sales from $8.5 million in 1966 to more than $18 million in 1968. It had the image of an innovative and dynamic electronics company in the forefront of the development and marketing of semiconductors.

Early in 1968, petitioner decided to enter the microwave field, an area in which it previously had not been engaged, and to attempt to gain an immediate reputation as a microwave company. This decision was kindled by petitioner's perception that there would be significant growth in the microwave communications business in the ensuing years.[1]

Petitioner believed that there would be rapid movement by other companies into the microwave field. Thus, it appeared necessary for it to gain an immediate presence or reputation as a microwave component manufacturing company in order

---

[1]Microwave technology first was developed during World War II in response to military needs. Vast sums were expended on microwave research after the war to accommodate increasingly complex military systems. In the 1950s, as the microwave art developed, new by-products began to find their way into nonmilitary applications such as radar, and, particularly, telecommunications. The concept of microwave telecommunications inspired very large investment in this new industry. However, because the U.S. Government insisted on emphasizing the military role in research and development expenditures and because of problems in using telephone lines for communication, civilian applications of microwave technology were slow to develop. Prior to the late 1960s, common carrier telephone companies primarily were interested in microwave. During the late 1960s, favorable administrative and judicial decisions appeared to permit private microwave communication companies to have access to telephone lines without special interconnection devices, which access the telephone companies had been resisting vehemently. Large growth in the microwave communications business was foreseen.

to compete successfully. Petitioner understood that it would be unable to gain an immediate reputation or presence if it relied solely upon internal growth, for it would take anywhere from 18 months to 2 years to produce and market a newly conceived microwave connector[2] and from 3 to 5 years to establish a reputation in the industry as a reliable source for the product. Therefore, it chose to enter the microwave business through the purchase of companies already engaged in that business.

Petitioner first made an unsuccessful stock tender offer for Ampherol Corp., a major electronics company which was a significant microwave component manufacturer. Petitioner realized an unexpected profit of more than $29 million as a result of this unsuccessful offer. Thus, petitioner had adequate funds to engage in a cash acquisition program. Petitioner also sought unsuccessfully to acquire Microwave Associates, one of the largest independent microwave companies, and a company with a record of $20 million in sales.

Petitioner then began to eye a number of smaller companies with the objective of entering the microwave industry by acquiring companies that collectively could offer a broad product line. This would allow petitioner to compete with such companies as Microwave Associates, a company which at that time offered the type of product mix that petitioner sought. Petitioner would have attempted to purchase any company in the microwave field that provided a product that fit within the spectrum that petitioner coveted. Conversely, petitioner would not have attempted to purchase two companies that made the identical product; the acquisition of only one would have satisfied petitioner's needs.

After deciding to acquire a number of smaller microwave companies, petitioner became interested in General RF Fittings, Inc., a company that manufactured microwave connectors.[3] GRFF's business consisted of the manufacture of elec-

---

[2]Between the time of inception to the time of marketing, a product design would have to be developed, plant and machinery would have to be acquired, parts would have to be ordered, and a labor force would have to be recruited.

[3]A connector is a device which is used to fasten two or more electronic components together. In August 1968, there were three categories of microwave connectors: (1) The ordinary commercial shield connectors, that is, inexpensive connectors used in portable radios, television, and other unsophisticated applications; (2) a series of connectors that had been developed and used in radar and transmitter systems during World War II and

tronic connectors in limited quantities for microwave applications in missiles, satellites, avionics, and undersea use, where size, weight, and premium operating performance were required. It was considered a high-quality, job-order specialty house.

GRFF was highly regarded in the connector industry, having had substantial before-tax profits generated from sales exceeding $1 million for the previous 5 years. It had a good reputation with its customers and was known for producing quality products. It was known as a dependable supplier that delivered on time, and, because it was a pioneer in the development of the product it manufactured, occupied a somewhat unique position in the industry. Its image as a reputable microwave connector company made it attractive to petitioner.

GRFF was engaged primarily in the custom connector business. The type of connector in which it specialized represented a very small fraction of the connector market. GRFF developed its connector business in the TNC and stainless steel areas. A TNC connector is not a specific type of connector, but encompasses a broad range of types and sizes. It is a threaded, medium-sized, medium-power connector with only a limited market. GRFF had continued as a manufacturer of custom connectors and, in this respect, had deviated from the trend of the industry as a whole, which was to concentrate on the miniature and subminiature types of connectors and on the types of standardized connectors that would be covered by military specification.[4]

---

thereafter formalized (some of these connectors were manufactured in compliance with military specifications); and (3) the class I, high-performance connectors custom manufactured in limited quantities for very sophisticated microwave circuits. The standard type of connectors, and those covered by military specifications, were used throughout the microwave industry and were manufactured in large volume. The custom connectors normally were manufactured in small volume, sometimes in as few as 5 or 10 pieces.

[4]In the middle 1960s, MIL-C-39012, a military specification standard, was formulated to standardize the design rules of the RF connector industry by establishing uniform specification and performance parameters so that customers could be assured of a certain measure of performance. MIL-C-39012 covers the bulk of the connectors used for medium-performance microwave applications for radar and communications applications. Although the specification came into being around 1965, the individual specification sheets did not appear until 1966 through 1968, after which time they came into general use.

By contrast, the custom connector area in which GRFF operated had a more demanding set of criteria than the MIL-C-39012 specification area. For the most part, GRFF chose not to pursue the mass-production market, but elected to stay in the custom market. However,

GRFF was a high-grade machine shop. It had no secret formulas or patented drawings of value. The equipment in GRFF's plant was ordinary machinery for working metal and plating, with little specialized equipment. GRFF filled specific customer orders in small quantities with connectors made to order. It did not produce connectors in volume or by using mass production techniques. GRFF did not sell in large quantities. It did not maintain a distributor network, but sold only through its own four sales representatives.

GRFF was attractive to petitioner because its acquisition would provide an addition to the broad line of products that petitioner was attempting to assemble and would provide an immediate competitive advantage in that area. The fact that GRFF's product was somewhat outmoded did not detract from its desirability.

Petitioner commenced negotiations for the acquisition of GRFF in July of 1968 with the shareholders of that corporation. These shareholders were members of the Potsdam family. William Kearns, then executive vice president of petitioner, contacted Jay Potsdam, who was president of GRFF, and informed him of petitioner's interest in acquiring GRFF. Mr. Potsdam told Mr. Kearns that his family was not interested in selling the company. Subsequently, Jay and Harold A. Potsdam met with Mr. Kearns, who was again told that GRFF was not for sale. Mr. Kearns continued to press the matter until he finally was given a figure of $3 million, all payable in cash, and not subject to negotiation.

On July 23, 1968, there was a meeting between the two Potsdams and various representatives of petitioner. After a brief discussion, petitioner offered $3.5 million for GRFF, to be paid in 3 years. The Potsdams declined to accept less than $3.9 million, all cash. This amount was readily agreed to by petitioner. The purchase price was to consist of $3.3 million for the stock of GRFF and $600,000 for the real property on which the plant was located.

The acquisition of the stock and real property of GRFF

to a limited degree, GRFF had started to engage in the MIL-C–39012 segment of the microwave business prior to its acquisition by petitioner, but soon decided not to compete in this area. GRFF never really had an opportunity to qualify or modify its product in accordance with specification sheets because of its acquisition by petitioner.

closed on August 29, 1968, pursuant to letter agreements and a memorandum of sale between the parties. Solitron did not seek or obtain an appraisal of GRFF before it purchased the company.

At approximately the same time petitioner purchased GRFF, it made a number of additional acquisitions in the microwave field. The other companies purchased were Filmohm Corp., ESCA (Electronic Standard Corp. of America), Microwave Chemical Laboratories, Plaxial, and Royal Microwave. The GRFF plant at Port Salerno, Fla., was expanded in size by 30 percent (10,000 square feet) as a result of these acquisitions. Petitioner also attempted other acquisitions, among them Microlab/FXR.

On August 28, 1968, petitioner's board of directors directed that GRFF should be liquidated and its liabilities discharged as soon as possible. Accordingly, GRFF was liquidated on January 13, 1969, and its assets and liabilities were then transferred to petitioner.[5]

On January 13, 1969, petitioner transferred the assets received from GRFF to Integronics, Inc. (hereinafter Integronics), a wholly owned subsidiary of petitioner. On February 18, 1969, Integronics changed its name to General RF Fittings, Inc. (hereinafter New GRFF). Upon transfer to Integronics,

---

[5]The general assignment of assets from GRFF to petitioner provided as follows:

KNOW ALL MEN BY THESE PRESENTS:

That General RF Fittings, Inc. a Florida corporation by Jack N. Popper, its president, its duly authorized agent, in consideration of all its outstanding capital stock the receipt of which is hereby acknowledged, hereby assigns and transfers to Solitron Devices, Inc. all of the assets of the corporation, including, but not limiting, all real and personal property, both tangible and intangible, all claims, whether matured or unmatured, all choses in actions, and all assets of every kind and nature.

IN WITNESS WHEREOF, said corporation has caused these presents to be signed in its name, by its President, and sealed with its corporate seal, attested by its Secretary.

Dated this 13th day of January, 1969.

General RF Fittings, Inc.

By: (S)  Jack N. Popper
JACK N. POPPER

ATTEST:      (S)   George Reiland
GEORGE REILAND, *Secretary*

petitioner did not retain any of the assets received from GRFF upon the liquidation of that company.[6]

Upon liquidation of GRFF into petitioner, petitioner allocated $958,551 of the $3.3 million stock purchase price to the tangible assets received. In making this allocation, GRFF's machinery was written up to its original cost to reflect the value of such assets. Petitioner allocated the balance of the purchase price, $2,341,449, to an intangible asset that it described on its general ledger and general journal for its fiscal year ended February 28, 1969, as "Goodwill re: General RF Fittings" and in its annual reports as "Excess of Purchase Price over Book Value of Assets Acquired."

The assets that had been received by petitioner upon liquidation of GRFF, and subsequently were transferred to Integronics, carried over their basis from petitioner to Integronics. However, the $2,341,449 attributable to the intangible asset was not recorded on New GRFF's books, but was retained on petitioner's books when the assets received by petitioner from GRFF were transferred to Integronics. The latter was renamed New GRFF shortly thereafter.

No effort was made by petitioner to secure the services of the personnel of GRFF by long-term contracts, or otherwise. From the outset, petitioner planned to operate GRFF using petitioner's key employees from its nearby Riviera Beach

---

[6]The general assignment of GRFF assets by petitioner to Integronics, Inc., provided as follows:

KNOW ALL MEN BY THESE PRESENTS:

That Solitron Devices, Inc., a New York Corporation, by Benjamin Friedman, its president, its duly authorized agent, hereby assigns and transfers to Integronics, Inc. all of the assets of General RF Fittings, Inc. which it has received in liquidation of said corporation, including, but not limiting, all real and personal property, both tangible and intangible, all claims, whether matured or unmatured, all choses in actions, and all assets of every kind and nature.

IN WITNESS WHEREOF, said corporation has caused these presents to be signed in its name by its President, and sealed with its corporate seal, attested by its Secretary.

Dated this 13th day of January, 1969.

SOLITRON DEVICES, INC.

By: (S) Benjamin Friedman
BENJAMIN FRIEDMAN, *President*

ATTEST: (S) Paul Windels, Jr.
PAUL WINDELS, JR., *Secretary*

plant. GRFF's president, sales manager, chief engineer, and production manager left GRFF shortly after the acquisition of GRFF by petitioner.

After purchasing GRFF, petitioner began to change the operations of that corporation. It was concluded by the sales and marketing arm of petitioner that the optimal means of enhancing its image in the microwave industry would be by implementing a "divisional" approach, rather than by maintaining a disconnected series of small companies. Thus, petitioner began to create a divisional image by developing its own logo and by phasing out the product identification that came from the individual companies acquired. However, the GRFF name was retained for corporate identification purposes. After some time, though, it was phased out and New GRFF's products were marketed under petitioner's name using the terminology "Solitron/Microwave."

In accordance with this plan, the ESCA corporation was moved into the GRFF building, as eventually was the Microwave Semiconductor Division. An extension also was added to the building to house the Plaxial operation.

Petitioner had little interest in the number and quality of GRFF's customers. The number of users of microwave companies was limited, and petitioner could readily have identified them. In the electronics industry, new contracts are based upon price, quality, and in some cases, uniqueness of product. At its acquisition, GRFF was a leader in the manufacture of a unique product, that is, TNC connectors. Nevertheless, petitioner began to direct its efforts toward a market entirely different from that in which GRFF had been engaged.

Some 3 to 5 months after the acquisition of GRFF, petitioner began the restructuring of GRFF's product line. From its sales staff, petitioner ascertained that the specialty products manufactured by GRFF would not generate the desired level of business, that the future was in the military specification types of microwave connectors. Accordingly, New GRFF began to undergo a change in product mix and a restructuring of product line, thereby transforming its products from specialty products to a standard line of products. It added new product lines and changed the design of existing product lines. GRFF designs were discarded or updated to meet new design criteria. New GRFF turned to the filling of large orders rather than

special ones, and it terminated the old GRFF sales representatives and began using distributors to market its products. This transformation took a substantial period of time, at least 1½ to 2 years. By February 28, 1971, the new designs were in wide use.[7]

Sometime in early 1971, New GRFF was liquidated by petitioner. The minute book of New GRFF contains a document entitled "Minutes of Action of the Shareholders of General RF Fittings, Inc. Taken as of March 1, 1971," providing as follows:

WHEREAS, Solitron Devices, Inc. owns all of the issued and outstanding voting stock of this Corporation; and

WHEREAS, Solitron Devices, Inc., as the sole shareholder, has determined it would be desirable to discontinue the operation of the Corporation and to dissolve the Corporation and transfer its assets to Solitron Devices, Inc; and

WHEREAS, it is necessary for this Corporation to hold an annual meeting of shareholders and to elect directors to govern the Corporation until it has been dissolved; and

WHEREAS, Solitron Devices, Inc. desires to waive notice of said meeting and to hold said meeting by written consent:

NOW, THEREFORE, BE IT

RESOLVED, that Solitron Devices, Inc. the sole voting shareholder of the Corporation, hereby waives notice of the annual meeting of shareholders of the Corporation; and be it further

RESOLVED, that the officers or directors of the Corporation are hereby authorized to take whatever steps are necessary to dissolve the Corporation and to transfer its assets to Solitron Devices, Inc., and to execute any documents necessary to achieve such purpose, and any steps heretofore taken with regard thereto are hereby ratified; and be it further

RESOLVED, that the following named persons be and they are hereby elected directors of the Corporation to serve until their successors are elected and qualified:

> Charles Whorl
> Joseph Friedman
> Richard Trivison
>
> (S)   Benjamin Friedman
>       BENJAMIN FRIEDMAN, *President*
>       Solitron Devices, Inc.

---

[7]New GRFF did not entirely terminate its production of custom-made connectors, because it felt bound to continue to supply such long-time customers of GRFF as NASA and RCA.

Also contained therein is a document entitled "Minute of Action of the Shareholders of General RF Fittings, Inc. taken as of June 8, 1971," which states:

WHEREAS, Solitron Devices, Inc. owns all of the issued and outstanding voting stock of this Corporation; and

WHEREAS, it is necessary for this Corporation to hold an annual meeting of shareholders and to elect directors to govern the corporation for the ensuing year;

WHEREAS, Solitron Devices, Inc. desires to waive notice of said meeting and to hold said meeting by written consent;

Now, THEREFORE, BE IT

RESOLVED, that Solitron Devices, Inc., the sole voting shareholder of the corporation, hereby waives notice of the annual meeting of shareholders of the Corporation; and, be it further

RESOLVED, that the following named persons be and they are hereby elected directors of the Corporation to serve until their successors are elected and qualified.

> Charles Whorl
> Joseph Friedman
> Richard Trivison
>
> (S)   Benjamin Friedman
>     BENJAMIN FRIEDMAN, *President*
>     Solitron Devices, Inc.

Another document entitled "Minute of Action of the Shareholders of General RF Fittings, Inc. taken as of June 8, 1971" provides:

WHEREAS, Solitron Devices, Inc. owns all of the issued and outstanding voting stock of this Corporation; and

WHEREAS, Solitron Devices, Inc., as the sole shareholder, has determined it would be desirable to discontinue the operation of the Corporation and to dissolve the Corporation and transfer its assets to Solitron Devices, Inc.; and

WHEREAS, it is necessary for this Corporation to hold an annual meeting of shareholders and to elect directors to govern the Corporation until it has been dissolved; and

---

Because of the unique nature of GRFF's specialty product, these customers would have experienced difficulties in obtaining another source for their needs. Petitioner felt honorbound to fulfill these carryover contractual responsibilities.

WHEREAS, Solitron Devices, Inc. desires to waive notice of said meeting and to hold said meeting by written consent;

Now, THEREFORE, BE IT

RESOLVED, that Solitron Devices, Inc., the sole voting shareholder of the Corporation, hereby waives notice of the annual meeting of shareholders of the Corporation; and be it further

RESOLVED, that the officers or directors of the Corporation are hereby authorized to take whatever steps are necessary to dissolve the Corporation and to transfer its assets to Solitron Devices, Inc., and to execute any documents necessary to achieve such purpose, and any steps heretofore taken with regard thereto are hereby ratified; and be it further

RESOLVED, that the following named persons be and they are hereby elected directors of the Corporation to serve until their successors are elected and qualified.

> Charles Whorl
> Joseph Friedman
> Richard Trivison
>
> _____
> BENJAMIN FRIEDMAN, *President*
> Solitron Devices, Inc.

Also submitted into evidence was a document entitled "Assignment of Assets From General RF Fittings, Inc. To Solitron Devices, Inc.," which provided as follows:

WHEREAS, Solitron Devices, Inc. owns all the issued and outstanding voting stock of this Corporation, and

WHEREAS, Solitron Devices, Inc. in February 1971 elected to liquidate this Corporation and discontinue its operations as General RF Fittings, Inc.

WHEREAS, in 1971 all the assets of General RF Fittings, Inc. were physically transferred to Solitron Devices, Inc., but no formal documentation of that transfer was made except on the books of the corporations,

Now THEREFORE, to evidence the foregoing prior transfers this Corporation hereby transfers all its rights, title and interest in all its assets to Solitron Devices, Inc.

IN WITNESS WHEREOF, the parties hereto, acting through their individually authorized officers have caused this assignment to be executed as of this 1st day of March 1971.

Attest:                                  General RF Fittings, Inc.
(S)   Joseph Friedman                    By:   (S)   R. J. Trivison
                                                         *President*

Attest:                                  Solitron Devices, Inc.
(S)   James S. Trager                    By:   (S)   Benjamin Friedman

This was the only executed document transferring title of New GRFF's assets to petitioner. Petitioner failed to produce its books of account for its fiscal year that began March 1, 1971.

During the 1971 fiscal year, an ultrasonic screw machine was transferred from petitioner to New GRFF. This is recorded on petitioner's General Ledger and on New GRFF's "Intercompany Account." No transfer of assets from New GRFF to petitioner was recorded on petitioner's books for its fiscal year ended February 28, 1971. As of February 28, 1971, New GRFF had a debit balance in its "Intercompany Account," indicating the presence of assets in that account.[8]

According to the Official Records of Martin County, Fla., the real property belonging to New GRFF was not transferred to petitioner until October 23, 1973.

Petitioner claimed an abandonment loss for the intangible asset in the amount of $2,341,449 on its tax return for the fiscal year ended February 28, 1971. This was reflected in petitioner's books of account. Petitioner reported a net operating loss on its tax return for its fiscal year ended February 28, 1971, resulting from the $2,341,449 deduction. This was carried back and used to offset income in that amount for petitioner's fiscal year ended February 28, 1970, a year during which it had not filed a consolidated return. Petitioner then applied for, and received, a refund of tax for the carryback year. The refund was paid in due course to petitioner. Petitioner's returns for its fiscal years ended February 28, 1971, and February 28, 1970, subsequently were audited.[9]

Respondent asserts that the claimed abandonment loss must be denied petitioner because the intangible asset upon which the loss deduction was based did not belong to petitioner, or,

---

[8]Another subsidiary, Soledei Italia, also had a debit balance in its "Intercompany Account" as of Feb. 28, 1971.

[9]On its Federal income tax return for the taxable year ended Jan. 31, 1967, Integronics reported no income and no deductions. It was a dormant corporation that year. On its Federal income tax return for the period ended Jan. 31, 1968, Integronics reported no income, and deductions of $238,427.53 for research and development expenses resulting in a loss in that amount. On its final return for the period July 1, 1968, through Aug. 31, 1968, a period of 2 months, GRFF reported gross income of $53,124. In its tax return for the fiscal

alternatively, that such asset was not, in fact, abandoned during petitioner's fiscal year ended February 28, 1971.

### OPINION

The first issue we must decide is whether petitioner purchased $2,341,449 in intangible assets along with its acquisition of GRFF's tangible assets or whether such assets were created by petitioner's purchase of that company. If the latter is true, then there is no question but that such assets were petitioner's to abandon during the year in issue.

A brief review of the essential facts should be helpful. In early 1968, petitioner made a decision to enter the microwave industry. In order to establish an immediate presence in this industry, it chose to gain entry by means of acquisition rather than by internal growth. Having been thwarted in its attempts at takeover of two large microwave companies, petitioner began to acquire a number of smaller companies which it hoped collectively would offer the broad product mix that petitioner desired. As part of this strategy, petitioner purchased GRFF, a reputable company which specialized in the manufacture of custom connectors. After a brief period of negotiation, petitioner agreed to pay the $3.9 million asking price of the GRFF shareholders. Of this amount, $3.3 million was paid for the stock of GRFF and $600,000 was paid for the underlying real property. The stated value of GRFF's tangible

---

year ended June 30, 1968, GRFF reported gross income of $1,253,166. In its tax return for the period ended June 30, 1967, GRFF reported gross income of $667,876.

On its Federal income tax return for the period ended Feb. 28, 1969, New GRFF reported total income of $820,794; total deductions of $457,127; taxable income before a net operating loss deduction of $363,665; net operating loss deduction of $554,860 (carried over from Integronics); and no taxable income and no tax.

On its tax return for the year ended Feb. 28, 1970, New GRFF reported total income of $1,178,436; total deductions of $718,791; taxable income before net operating loss of $459,645; net operating loss deduction of $209,665 (carried over from Integronics); taxable income of $249,980; and total tax of $125,560. Prior to the transfer of GRFF to New GRFF (formerly Integronics) the latter was an inactive corporate shell that nevertheless possessed substantial net operating loss carryovers. Petitioner sought to, and in fact did, offset earnings of the business acquired from GRFF against these net operating loss carryovers in the total amount of $573,330.

assets was $958,551. It is the treatment of the stock consideration in excess of this stated amount that is in issue.

Petitioner contends that as a result of its haste to enter the burgeoning microwave industry, it paid a premium for GRFF's stock that far exceeded the fair market value of that stock. By acquiring GRFF, petitioner asserts, it augmented its product mix, thereby creating a previously nonexistent intangible asset with a basis of $2,341,449. This intangible asset was alleged to be petitioner's new image as a producer of high-performance microwave connectors custom-manufactured in limited quantities for sophisticated microwave circuits. It is argued that this asset never belonged to GRFF since it was created solely by the synergistic fit of that company into the larger unity brought together through petitioner's efforts. In reaching this conclusion, petitioner posits that GRFF possessed no goodwill or going-concern value at the time of its purchase.

Respondent counters by arguing that GRFF possessed intangible assets in the nature of goodwill and going-concern value at the date of acquisition and that the amount paid by petitioner for GRFF's stock in excess of the amount attributable to GRFF's tangible assets is allocable to such intangible assets. Accordingly, when GRFF was liquidated and its assets dropped into a newly created subsidiary, petitioner transferred ownership of the intangible assets previously held by GRFF to that subsidiary.

As is evident, the underlying dispute centers on whether petitioner or New GRFF owned the intangible asset(s) at the time of the purported abandonment. If petitioner is correct in its assertion that it created an intangible asset in its own hands with its purchase of GRFF, then it follows that petitioner retained the asset upon liquidation and reincorporation of the GRFF enterprise. If respondent is correct that the intangible assets followed the tangible assets of GRFF into the newly formed corporate entity, we must still decide whether that entity, New GRFF, was liquidated during petitioner's taxable year ended February 28, 1971, and then whether the intangible assets were abandoned by petitioner during that year.

We begin with the axiom that petitioner bears the burden of

proof. *Welch v. Helvering*, 290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure. Ordinarily, upon the purchase of the stock of one corporation by another, the acquiring corporation assumes a cost basis in the purchased stock. Sec. 1012, I.R.C. 1954. The cost is the amount paid for the property received. Sec. 1.1012–1(a), Income Tax Regs. Section 334(b)(2) provides that if a subsidiary is purchased by the parent corporation and liquidated shortly thereafter, the parent's basis in the property distributed to it is equal to the adjusted basis of the stock of the subsidiary with respect to which the distribution was made. Thus, in the case of a purchase of all the stock of a subsidiary followed by a liquidation of that subsidiary, the parent would take an aggregate basis in the distributed property equal to its cost basis in the stock. This basis must be allocated to the individual assets, both tangible and intangible, received from the liquidated subsidiary in proportion to their respective fair market values. Sec. 1.334–1(c)(4)(viii), Income Tax Regs. Application of these rules is mandatory, not elective. *Broadview Lumber Co. v. United States*, 561 F.2d 698, 711 (7th Cir. 1977). To complete the analysis, if the parent corporation then drops all of the recently distributed assets into a newly formed subsidiary, its basis in the stock of the subsidiary will be equal to its aggregate basis in those assets (which in turn was equal to its cost basis in the first subsidiary's stock). Sec. 358(a).

Applying these rules to the instant case, respondent asserts that petitioner's basis in the stock of GRFF was, pursuant to section 1012, the amount paid for that stock, that is, $3.3 million. Upon the subsequent liquidation of GRFF, petitioner's basis in the assets was to be determined by allocating the $3.3 million in proportion to the relative fair market values of the assets. The parties apparently are in agreement that the fair market value, and consequently the allocable basis, of the tangible assets acquired upon GRFF's liquidation was $958,551. Respondent departs from petitioner's portrayal by insisting that the remainder of the purchase price, $2,341,449, is allocable to the intangible assets of GRFF purchased by petitioner. All assets received by petitioner from GRFF then were transferred by the general assignment of assets to the newly formed subsidiary, New GRFF.

Petitioner describes a different version. It maintains that

GRFF's fair market value was equal to the fair market value of its tangible assets, and that the excess purchase price constituted a "premium" paid by petitioner to secure an immediate image as a reputable manufacturer of custom-made connectors. This image, petitioner alleges, was an intangible asset created by petitioner upon its purchase of GRFF and held continuously by petitioner until its eventual abandonment.

Petitioner proposes a somewhat unique exception to section 1012. According to its spontaneous-creation theory, the normal cost basis rule that property obtained from the seller receives a basis equal to the consideration given by the buyer (sec. 1.1012-(a), Income Tax Regs.) is suspended, or at least extended into a new realm. Here, according to petitioner, the stock acquired from GRFF takes as a basis only a fraction of the amount paid for it, with the remainder of the purchase price forming the cost basis of petitioner's spontaneously created intangible asset.

In order for us to uphold petitioner's position in its entirety, we would be required to find that GRFF had no goodwill and no going-concern value at the time it was purchased. We would then have to find that, once title to the stock passed, an intangible asset was born, an immaculate conception of sorts, in the hands of the purchaser. Thus, we would have to accept the unusual concept that cost basis can be allocated to property other than the property purchased. This we refuse to do, although we compliment the attorneys for petitioner on their creative reasoning.

We first address the issue of whether GRFF possessed any goodwill at the time of its purchase. If so, petitioner acquired such goodwill with the purchase of GRFF's stock. *Winn-Dixie Montgomery, Inc. v. United States*, 444 F.2d 677, 681 (5th Cir. 1971); *Webster Investors, Inc. v. Commissioner*, 291 F.2d 192, 195 (2d Cir. 1961), affg. a Memorandum Opinion of this Court;[10] *Peerless Investment Co. v. Commissioner*, 58 T.C. 892, 895 (1972).[11] The question of whether goodwill exists is to be

---

[10]T.C. Memo. 1960–74.

[11]See also *Fox & Hounds, Inc. v. Commissioner*, T.C. Memo. 1962–229; *Yellow Cab & Baggage Co. v. Commissioner*, a Memorandum Opinion of this Court dated Sept. 15, 1950.

resolved based upon the particular facts and circumstances. *Staab v. Commissioner*, 20 T.C. 834, 840 (1953).

Goodwill is an amorphous concept which consists of "the sum total of those imponderable qualities which attract the custom of a business." *Grace Bros., Inc. v. Commissioner*, 173 F.2d 170, 175–176 (9th Cir. 1949). Goodwill has been defined as—

the advantage or benefit, which is acquired by an establishment beyond the mere value of the capital, stock, funds, or property employed therein, in consequence of the general public patronage and encouragement which it receives from constant or habitual customers, on account of its local position, or common celebrity, or reputation for skill, or affluence, or punctuality, or from other accidental circumstances or necessity, or even from ancient partialities or prejudices. [*Metropolitan Bank v. St. Louis Dispatch Co.*, 149 U.S. 436, 446 (1893).] [12]

Goodwill exists where there is an "expectancy of both continuing excess earning capacity and also of competitive advantage or continued patronage." *Wilmot Fleming Engineering Co. v. Commissioner*, 65 T.C. 847, 861 (1976). More succinctly, it has been described as the probability that "old customers will resort to the old place." *Metallics Recycling Co. v. Commissioner*, 79 T.C. 730 (1982); *Brooks v. Commissioner*, 36 T.C. 1128, 1133 (1961); see also *Miller v. Commissioner*, 56 T.C. 636, 649 (1971). The indicia of goodwill are numerous and include practically every imaginable trait that has a positive bearing on earnings.

After an exhaustive review of the case law and a thorough examination of the record, we are of the opinion that GRFF possessed substantial goodwill at the time it was purchased by petitioner. GRFF was a successful company which had a reputation within the industry and among its customers for manufacturing unique, high-quality products. It was known for dependability and timely delivery. Petitioner asserts that the intangible it created by acquiring GRFF was the image of a reputable manufacturer of custom-made connectors, an image that gave it an immediate competitive boost it could not otherwise have obtained. Petitioner contends that it created

---

[12]See *Pfleghar Hardware Specialty Co. v. Commissioner*, 11 B.T.A. 361, 363–364 (1928); *Seaboard Finance Co. v. Commissioner*, T.C. Memo. 1964–253, affd. 367 F.2d 646 (9th Cir. 1966).

this image. We believe that the "image" that petitioner alleges it created was precisely the same image owned by GRFF prior to its sale.

A history of high earnings, reliability, a reputation for quality, and the competitive edge resulting from these traits and from the uniqueness of the product sold all are indicative of goodwill. See *Buddy Schoellkopf Products, Inc. v. Commissioner*, 65 T.C. 640, 647 (1975); *Miller v. Commissioner, supra* at 649; *Schulz v. Commissioner*, 34 T.C. 235, 248 (1960), affd. 294 F.2d 52 (9th Cir. 1961); *Friedlaender v. Commissioner*, 26 T.C. 1005, 1017 (1956); *LeVine v. Commissioner*, 24 T.C. 147, 156 (1955); *Staab v. Commissioner, supra* at 840; *Estate of Trammell v. Commissioner*, 18 T.C. 662, 668 (1952); *Clarence Whitman & Sons, Inc. v. Commissioner*, 10 T.C. 264, 272 (1948).[13] The GRFF name carried with it an "aura" of quality and reliability. Petitioner exploited the characteristics associated with the GRFF name by continuing the company under that name for a period of time subsequent to its purchase of the company. This suggests that petitioner was aware of and attempted to benefit from the goodwill of GRFF. See *Winn-Dixie Montgomery, Inc. v. United States, supra* at 681; *Miller v. United States*, 181 Ct. Cl. 331, 347 (1967); *Cohen v. Kelm*, 119 F. Supp. 376, 379 (D. Minn. 1953).

It is undisputed that GRFF had an excellent reputation for the manufacture of a quality product. It also had an impressive earnings history over the 5 years prior to its acquisition. We find that GRFF possessed substantial goodwill at the time of its purchase, and that the existence of this intangible asset was reflected in the consideration paid by petitioner for its stock.

We next turn to the question of whether GRFF had any going-concern value at the time petitioner acquired it. Going-concern value has been defined as "the additional element of value which attaches to property by reason of its existence as an integral part of a going concern." *VGS Corp. v. Commissioner*, 68 T.C. 563, 591 (1977); *Conestoga Transportation Co. v. Commissioner*, 17 T.C. 506, 514 (1951). It is

---

[13]See also *Proctor v. Commissioner*, T.C. Memo. 1981–436; *Fedders Corp. v. Commissioner*, T.C. Memo. 1979–350, affd. by unpublished order (3d Cir., May 8, 1981); *H & R Distributing Co. v. Commissioner*, T.C. Memo. 1972–203; *Broyles v. Commissioner*, T.C. Memo. 1962–215.

manifested by the ability of the acquired business to continue generating sales without interruption during and after acquisition. *Concord Control, Inc. v. Commissioner*, 78 T.C. 742, 746 (1982); *Computing & Software, Inc. v. Commissioner*, 64 T.C. 223, 234 (1975). A number of cases have not distinguished between goodwill and going-concern value. See, for example, *Computing & Software, Inc. v. Commissioner, supra* at 234–235; *Winn-Dixie Montgomery, Inc. v. United States*, 444 F.2d 677, 685 (5th Cir. 1971). Others have. See, for example, *VGS Corp. v. Commissioner, supra* at 591.

We believe that GRFF possessed going-concern value at the time of its acquisition. We have found as a fact that, if petitioner had relied upon internal growth to develop a business identical to that of GRFF, it would have taken 18 months to 2 years to produce and market its product and from 3 to 5 years to establish the reputation enjoyed by GRFF. GRFF had before-tax profits generated from sales exceeding $1 million for the 5 years prior to its acquisition and had a good reputation with its customers. Certainly, GRFF possessed that "additional element of value that attaches to property because of its existence as part of an ongoing business." *Concord Control, Inc. v. Commissioner, supra* at 746. This value was not diminished by the change of ownership; there was no interruption of sales inflicted upon GRFF as a result of its acquisition. The fact that petitioner eventually shifted GRFF's business away from the production of custom connectors does not have the effect of reducing the value of GRFF's ongoing business at the time of purchase.

We recognize that there frequently is an overlap between the goodwill and going-concern value of a business. See *Winn-Dixie Montgomery, Inc. v. United States, supra* at 685, and cases cited therein. However, we need not establish a strict boundary between the two concepts since it is not necessary in this instance to allocate values to each of the intangible assets that have been found to have existed during the purchase of GRFF.

The sale of GRFF was a sale between unrelated parties at arm's length. In such circumstances, the sales price is the best evidence of fair market value. *Florida Publishing Co. v. Commissioner*, 64 T.C. 269, 280 (1975), affd. by unpublished order (5th Cir., Apr. 25, 1977). Fair market value is the price at

which property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell, and both reasonably informed as to all relevant facts. See *VGS Corp. v. Commissioner, supra* at 588–589. Petitioner in essence contends that it was under a "compulsion" to purchase GRFF in order to carry out its objective of establishing a broad product mix that could successfully compete with the larger microwave companies. Consequently, petitioner asserts, it was compelled to pay a premium above and beyond the fair market value of GRFF in order to pry ownership away from the somewhat stubborn sellers.

It is true that the sellers of GRFF took a firm stance in the abbreviated negotiations between the parties, demanding an up-front cash payment of $3.9 million. Petitioner offered little resistance, appearing quite willing to meet this price. We believe that the resulting price reflected the substantial goodwill and going-concern value that was transferred to petitioner along with GRFF's tangible assets. We do not accept the proposition that GRFF's prior owners were unwilling sellers. On the contrary, they were quite ready to sell the company at the right price, and petitioner was quite willing to pay this price. Petitioner's lofty aspirations with respect to GRFF did not give rise to a "compulsion" to purchase that company, they simply produced the usual motivations prompting a willing buyer. As we stated in *Florida Publishing Co. v. Commissioner, supra* at 280, "Different purchasers see different benefits in making acquisitions and such benefits do not necessarily give rise to calling a portion of the acquisition cost a 'premium.'" Here, we conclude that the price paid by petitioner is the best evidence of fair market value and that such price constituted the fair market value of GRFF at the time of acquisition. The so-called "premium" alleged to have been paid by petitioner was paid for the substantial goodwill and going-concern value of GRFF. See *Winn-Dixie Montgomery, Inc. v. United States, supra* at 686. The "image" enjoyed by petitioner immediately after the acquisition of GRFF was not created by that acquisition, but was purchased along with the tangible assets of GRFF from the owners of that company.

In the case of a business possessing goodwill and going-concern value, where the fair market value of the business as a whole and the fair market value of the tangible assets of the

business have both been established, the "residual" or "gap" method of valuation is a proper method for determining the value of the intangible assets owned by the business. Under such method, the value of the intangible assets equals the difference between the total purchase price and the value of the tangible assets. See *R. M. Smith, Inc. v. Commissioner*, 69 T.C. 317, 320 (1977), affd. 591 F.2d 248 (3d Cir. 1979); *Florida Publishing Co. v. Commissioner, supra* at 281; *Massey-Ferguson, Inc. v. Commissioner*, 59 T.C. 220, 231 (1972); *McKinney Manufacturing Co. v. Commissioner*, 10 T.C. 135, 140 (1948); *Jack Daniel Distillery v. United States*, 180 Ct. Cl. 308, 379 F.2d 569, 579 (1967).[14] Here, because the parties have stipulated to the value of the tangible assets of GRFF and because we have determined the value of the company as a whole, we hold that the residual method is the appropriate method of establishing the value of the intangible assets of GRFF.

Due to the vigor with which petitioner propounds its spontaneously created basis theory, we deem it appropriate to examine this contention in greater detail. In general terms, petitioner's theory stands for the proposition that an amount paid for property in excess of that property's fair market value constitutes a premium which is not attributable to the cost basis of the property. Rather, this premium gives birth to a quantity of free-floating basis which attaches to an alleged intangible asset which is none other than the incarnation of the expected surplus benefit that motivated the purchaser to pay the surplus price.[15] This proposition runs counter to the principle that a buyer's cost basis in stock includes the entire consideration paid for the stock despite the fact that he got the worst of the bargain by paying an amount in excess of fair

---

[14]See also *Proctor v. Commissioner*, T.C. Memo. 1981–436; *Black Industries, Inc. v. Commissioner*, T.C. Memo. 1979–61; *R. M. Smith, Inc. v. Commissioner*, T.C. Memo. 1977–23, affd. 591 F.2d 248 (3d Cir. 1979); *Pensacola Greyhound Racing, Inc. v. Commissioner*, T.C. Memo. 1973–225, affd. by unpublished order (5th Cir., Sept. 3, 1974); *H & R Distributing Co. v. Commissioner*, T.C. Memo. 1972–203; *Plantation Patterns, Inc. v. Commissioner*, T.C. Memo. 1970–182, affd. 462 F.2d 712 (5th Cir. 1972); *Philadelphia Steel & Iron Corp. v. Commissioner*, T.C. Memo. 1964–93, affd. 344 F.2d 964 (3d Cir. 1965); *Charlotte Corp. v. Commissioner*, T.C. Memo. 1960–97, affd. sub nom. *Meister v. Commissioner*, 302 F.2d 54 (2d Cir. 1962).

[15]Again, we have found as a fact that no such premium was paid in this case.

market value. See *Commissioner v. Matheson*, 82 F.2d 380, 381 (5th Cir. 1936), affg. 31 B.T.A. 493 (1934).[16]

More importantly, if we were to accept petitioner's theory, we would be guilty of engendering an administrative nightmare. One of the verities of tax law is that the cost basis of property is equal to the amount of cash paid for such property. Petitioner's proposition would demolish this faithful truism, opening the door to a vast new arena of controversy. We refuse to open this door.

The fallacy underlying petitioner's position stems from its confusion in distinguishing between value and basis. We would agree that an art collector's purchase of the 10th and final painting in a series would have a positive effect upon the value of the related property. However, the increment in value does not produce a corresponding increment in the basis of the affected property. The premium paid to acquire the last painting is part of the cost basis of that final purchase. This result is mandated under section 1012 and section 1.1012–1(a), Income Tax Regs. To hold otherwise would create a chaotic situation permitting the manipulation of basis according to the whims and fancies of each individual taxpayer. If such a proposition were carried to its logical extreme, any indirect benefit derived by a purchaser as a result of the acquisition of property would require some sort of basis allocation. We would prefer to stick with the proper rule: the cost basis of property is the amount of cash paid for that property.[17] Sec. 1012; sec. 1.1012–1(a), Income Tax Regs. Thus, even if petitioner were

---

[16]See also *Spitcaufsky v. Commissioner*, a Memorandum Opinion of this Court dated Jan. 20, 1954. Compare *P & R Investors, Inc. v. Commissioner*, T.C. Memo. 1963–284.

[17]We are not unmindful of a number of cases wherein the purchaser of property for more than fair market value has been denied that portion of basis attributable to the excess purchase price. However, in these atypical cases, the parties were not adverse and did not deal at arm's length. Accordingly, where the parties are related, and a payment in excess of fair market value is a disguised dividend, gift, contribution to capital, or the like, the cost basis of property might not be equal to the value received by the seller. See *Majestic Securities Corp. v. Commissioner*, 120 F.2d 12 (8th Cir. 1941), affg. 42 B.T.A. 698 (1940); *Mountain Wholesale Co. v. Commissioner*, 17 T.C. 870, 875 (1951); *New Hampshire Fire Insurance Co. v. Commissioner*, 2 T.C. 708, 724 (1943), affd. 146 F.2d 697 (1st Cir. 1945); *Estate of Monroe v. Commissioner*, 45 B.T.A. 1061, 1072 (1941); *McDonald v. Commissioner*, 28 B.T.A. 64, 66 (1933); *Memphis Transit Co. v. United States*, 155 Ct. Cl. 797 (1961), 297 F.2d 542, 545 (1962); *Broadwell Construction Co. v. United States*, an unreported case (E.D. N.C. 1977, 40 AFTR 2d 77–6072, 77–2 USTC par. 9725). This is not the situation in the instant case.

correct in its assertion that it paid a premium for the GRFF stock, such premium would still be allocable to petitioner's cost basis in the GRFF stock rather than to the enhanced value of petitioner's own corporate entity indirectly resulting from the acquisition.

Having found that GRFF owned intangible assets with a value determined by application of the residual method of valuation, it follows that the totality of such assets was transferred to New GRFF by the general assignment of assets. Such assignment transferred all assets received by petitioner from GRFF; therefore, any contention that GRFF"s goodwill and going-concern value were retained by petitioner upon formation of New GRFF is inconsistent with the plain language of the assignment. Furthermore, such retention would have been virtually impossible, since, as a general rule, such intangibles are inseparable from the underlying assets. See *Webster Investors, Inc. v. Commissioner*, 291 F.2d 192, 195 (2d Cir. 1961), affg. a Memorandum Opinion of this Court; *Peerless Investment Co. v. Commissioner*, 58 T.C. 892, 895 (1972); *Gumpel v. Commissioner*, 2 B.T.A. 1127, 1129 (1925); *Cohen v. Kelm*, 119 F. Supp. 376, 378 (D. Minn. 1953).[18] We hold that the intangibles previously belonging to GRFF were transferred to New GRFF along with the underlying tangible assets.

Petitioner argues in the alternative that even if we find that New GRFF owned the intangible asset(s) in question, it is still entitled to an abandonment loss deduction for such assets for its taxable year ended February 28, 1971, on the ground that New GRFF was liquidated in February of 1971, prior to the end of petitioner's taxable year. Respondent maintains that New GRFF was not liquidated until the succeeding taxable year, and therefore, petitioner did not come into possession of any intangible property held by New GRFF until that time.

Both parties are guilty of erroneous reasoning. We are not concerned with the precise time of liquidation. Liquidation generally is a process that can extend over a period of months or even years. See *McDaniel v. Commissioner*, 25 T.C. 276, 280–281 (1955); *Estate of Fearon v. Commissioner*, 16 T.C. 385, 394–395 (1951); *R. D. Merrill Co. v. Commissioner*, 4 T.C. 955, 969

---

[18]See also *Fox & Hounds, Inc. v. Commissioner*, T.C. Memo. 1962–229.

(1945). In fact, we can assume for argument's sake that some liquidation activities commenced prior to March 1, 1971, and that such activities continued well into petitioner's following taxable year. This does not resolve the issue.

The critical question is one of ownership, or, more specifically, whether New GRFF distributed its assets, including its intangible assets, to petitioner prior to March 1, 1971. In order for petitioner to be entitled to a loss deduction on account of its abandonment of certain assets, it is an obvious prerequisite that petitioner be the owner of such assets. It matters not that New GRFF began its liquidation in February of 1971 if its distribution of assets took place on or after March 1, 1971, the first day of petitioner's new taxable year.

The timing of the distribution of assets is a question of fact, upon which petitioner bears the burden of proof. *Welch v. Helvering*, 290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure.

The liquidation of New GRFF did not require or give rise to a *physical* transfer of assets. Since petitioner was the sole shareholder of New GRFF stock, and since the New GRFF facilities continued to operate in conjunction with the unified Solitron complex, the liquidation was essentially a documentary one. The transfer of assets therefore must be, and can only be, established by means of the records and documents of the related corporations. We find that petitioner has failed to establish that the New GRFF tangible assets, and accordingly its intangible assets, were distributed from New GRFF at any time prior to March 1, 1971.

The only documentation of the transfer of New GRFF's assets to petitioner introduced into evidence was the Assignment of Assets from General RF Fittings, Inc., to Solitron Devices, Inc., dated "as of this 1st day of March 1971." Of course, an assignment as of March 1, 1971, is too late to help petitioner. The assignment states that New GRFF's assets were "physically transferred" to petitioner at some prior date, but "that no formal documentation of that transfer was made except on the books of the corporation." As we said before, no physical transfer of the assets was undertaken and since no formal documentation was made, petitioner's only hope could be that the books of the corporations establish a transfer prior to March 1, 1971. With respect to the assignment, one

additional comment is instructive. The document purports to transfer all of New GRFF's "rights, titles and interest in its assets to" petitioner as of March 1, 1971. Thus, even if the transfers were recorded on the books of the two corporations sometime in February, it appears that ownership did not change hands until the date recited in the assignment.[19]

Petitioner asserts that its accountants were instructed to place New GRFF's assets on petitioner's books as of the beginning of the new fiscal year, that is, as of March 1, 1971. Petitioner's books of account indicate that New GRFF still held its assets as of February 28, 1971. Petitioner asserts that the appropriate bookkeeping entries establishing the transfer were made on the books of petitioner as of March 1, 1971. However, petitioner was not able to introduce such books into evidence since they had been lost during the intervening years. We repeat that a transfer of assets to petitioner on March 1, 1971, is too late to permit petitioner to take an abandonment loss deduction for those assets during its taxable year ended February 28, 1971.

Assuming, arguendo, that we had found that petitioner did in fact become the owner of New GRFF's assets at some time during mid- or late February of 1971, and assuming that we had found that the intangible assets in question were abandoned, petitioner would still have an extremely difficult time proving its entitlement to the abandonment loss deduction. Petitioner argues that the abandonment of the intangible assets resulted from its transformation of the business of GRFF from that of the custom connector business into the military specification connector business. This transformation allegedly took almost 2 years to complete. Yet, in order for petitioner to be entitled to the claimed abandonment loss deduction for its taxable year ended February 28, 1971, we would have to find that such abandonment was effectuated *after* petitioner came into possession of the intangible assets but *before* the close of the taxable year. Thus, assuming the transfer of assets was made on February 14, 1971, a date that is wholly unsupported by the facts, we would have to find that abandonment occurred at some time within the next 2 weeks.

---

[19]We note that ownership of the realty possessed by New GRFF was not transferred until Oct. 23, 1973.

At most, there is minimal, though insufficient, support for the assertion that the assets were transferred on February 28. This means that petitioner would be entitled to the claimed deduction only if abandonment occurred after such transfer but before March 1, a highly unlikely proposition.

No matter. We find that the assets were not transferred prior to March 1, 1971, and, therefore, that petitioner is not entitled to the abandonment loss deduction claimed on its income tax return for the year ended February 28, 1971.[20]

To reflect the foregoing,

*Decision will be entered for the respondent.*

---

[20]Because of this finding, we need not reach the issue of whether the intangible assets in question were, in fact, abandoned during the year in question.