T.C. Memo. 2001-260

UNITED STATES TAX COURT

BEMIDJI DISTRIBUTING CO., INC., Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

CORTLAND F. LANGDON AND JEAN M. LANGDON, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 7186-99, 7264-99.          Filed October 1, 2001.

Garry A. Pearson and Jon J. Jensen, for petitioners.

Blaine C. Holiday, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

PARR, Judge:  In separate notices of deficiency,[1]
respondent determined deficiencies in petitioners' income taxes
as follows:

---

[1]These cases have been consolidated for purposes of trial,
briefing, and opinion.

- 2 -

| Petitioner | Docket No. | Year | Deficiency |
|---|---|---|---|
| Bemidji Distributing Co.(BDC) | 7186-99 | 2/28/93 | $408,000 |
| Cortland F. and Jean M. Langdon (the Langdons) | 7264-99 | 12/31/92 | 9,905 |

The deficiencies stem from the 1992 sale of the assets of BDC, an ongoing wholesale beer distributor, to Bravo Beverage, Ltd. (Bravo) for $2,017,461. Bravo required that the purchase agreement between it, BDC, and petitioner Cortland F. Langdon (Mr. Langdon) (BDC's president and sole shareholder), allocate $1.2 million of the purchase price to two agreements with Mr. Langdon: $200,000 to a 2-year consulting agreement and $1 million to a 5-year covenant not to compete. Nothing was allocated to certain intangible assets, including goodwill, going concern value, or exclusive distribution rights with two major brewing companies.

After concessions,[2] the issues for decision are: (1) Whether all or part of Bravo's payment to Mr. Langdon for the covenant not to compete was a disguised payment for intangibles, taxable to BDC, and a nondeductible dividend to Mr. Langdon; and (2) whether a portion of BDC's payment of sales expenses was a nondeductible constructive dividend to Mr. Langdon, paid to obtain the covenant not to compete and the consulting agreement.

---

[2]Respondent concedes that the parties to the sale and exchange properly allocated $200,000 to the 2-year consulting agreement between Bravo and Mr. Langdon.

All section references are to the Internal Revenue Code in effect for the taxable years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulated facts and the accompanying exhibits are incorporated herein by this reference.

BDC is a Minnesota corporation, whose primary place of business was in Bemidji, Minnesota, when it filed its petition in these cases. When they filed their petition, the Langdons resided in Bemidji, Minnesota.

A.  BDC and the Wholesale Beer and Beverage Distribution Business

In 1933, Mr. Langdon's father founded BDC. BDC grew to be the largest wholesale beer distributor in northern Minnesota, enjoying an estimated 53 percent of the wholesale beer sales in its geographic market by 1990.

Mr. Langdon became part owner of BDC in 1943 and began full-time employment with the company in 1945. He operated the business for 46 years until he sold it to Bravo.

Since its founding, BDC maintained its business offices and warehouse in Bemidji, the county seat of Beltrami County. It had customers in seven counties in northern Minnesota, including all of Beltrami, Clearwater, and Hubbard Counties and parts of Cass, Itasca, Koochiching, and Polk Counties. Of its 242 customers

that year, 130 were "on-premises" retail outlets (i.e., bars and restaurants), and 112 were "off-premises" retail outlets. Mr. Langdon had lived in Bemidji all his life and had made it a point to know all the tavern and restaurant operators in town. Some customers had been personal friends for as long as 20 years, but there was a large turnover of others because many were tavern owners or operators who tended to turn over their businesses.

In 1990, BDC served a geographic market with approximately 74,000 permanent residents. Of those, about 25,000 lived within 5 miles of Bemidji, the only city of significant size within a 100-mile radius. In addition, a large number of part-time summer residents, tourists, and others visit the area each year. There are around 100 resorts in the region around Bemidji, with large tracts of Federal, State, and privately owned forests, as well as lakes and rivers. Itasca State Park is 32 miles southwest of Bemidji.

During 1990, wholesale beer distributors in that market sold about 700,000 cases of beer. Of that, BDC sold 369,864 cases of beer on the basis of "24/12 ounce equivalents". BDC held exclusive distribution rights from Miller Brewing Co., Stroh's Brewing Co., Minnesota Brewing Co., Leinenkugel Brewing Co., and Martlet Importing Co. in all of Beltrami, Clearwater, and Hubbard Counties and in parts of Cass, Itasca, Koochiching, and Polk Counties. The only large breweries with which it did not have

distribution agreements were Anheuser Busch (Budweiser), Pabst, and Coors.

During its tax years ended February 28, 1991, and February 29, 1992, BDC generated $197,923 and $215,236 net after-tax income, respectively. Net income before taxes was $337,554 in 1991 and $361,362 in 1992. Simple cashflow (before depreciation, amortization, interest, and principal payments on debt and taxes), with certain adjustments for optional or one-time expenses, was $366,500 for 1990 and $420,500 for 1991.[3]

The company had 10 employees and owned all its operating assets, including its delivery trucks and office and warehouse space. In each of the years 1991 and 1992, the company paid Mr. Langdon $90,000 in wages.

B. Sale of BDC's Assets

By early 1990, Mr. Langdon began to consider the possibility of selling BDC's business. At that time, Mr. Langdon and his wife, respectively, were approximately 69 years old and 68 years old. Nevertheless, he was ambivalent about selling. He and his wife were in good health, and Mr. Langdon worked every day, actively managing every aspect of the business. He had expanded the business throughout the 1980's and continued to do so up until the time of sale. For instance, in 1988 Mr. Langdon added

---

[3]These figures are included in the accountants' statement furnished with the offering.

Matilda Bay wine coolers to his list of products. In 1989, he obtained permission to purchase the distribution rights to Coors Beer. After negotiations with Coors, however, Mr. Langdon withdrew because he viewed Coors' sales quotas as impossible to achieve in his region. The minutes of the April 24, 1989, annual directors' meeting state that "Bemidji Distributing Company will persue [sic] other brand acquisitions."

The minutes also reflect other plans for expansion:

> The President also advised that an addition to the warehouse will be necessary in the immediate future because of the increasing number of brands and packages introduced by brewery suppliers, and the fact that the storage area for company owned vehicles has been beyond capacity for a number of years. The demand by Miller for a 45-day inventory from spring through summer also presents a storage space problem.

At the time of the sale, the Anheuser Busch (the largest brewery in the nation) distributorship and Skaar Distributing (Skaar), who sold Pabst, were BDC's competitors. The owner of Skaar had died, and his son sent out feelers to see whether Mr. Langdon wanted to buy it.

However, Mr. Langdon had no sons and did not want to pass on the business to his two daughters. More importantly, he also dreaded having to renegotiate a Teamsters' contract that was set to expire in May 1994, because past negotiations had been bitter. No other distributor north of the Twin Cities had a union contract.

Around April 1990, Mr. Langdon contacted Pohle Partners, Inc. (Pohle Partners), a company that specialized in appraising and brokering the sale of wholesale beer distribution businesses throughout the United States, to discuss a possible sale of BDC.[4]

In mid 1990, Mr. Langdon agreed to have Pohle Partners appraise BDC's business and to preliminarily market it to potential purchasers. He made it clear that he had made no firm decision to sell, and Pohle Partners so stated in the offering package. It was understood that BDC and Mr. Langdon would have to approve the terms of any offer. No fee would be owed to Pohle Partners, unless a sale was consummated and BDC and Mr. Langdon were paid. However, if the company were sold, Pohle Partners would receive a specified percentage of the total purchase price. For purposes of determining this fee, the total purchase price

---

[4]Pohle Partners was well known throughout the wholesale beer industry and enjoyed an excellent reputation as a broker. Since about 1978, it had brokered hundreds of sales of wholesale beer businesses. Mr. Langdon was acquainted with Paul L. Pohle and Robert W. Pohle, the two principals of Pohle Partners. Paul Pohle had previously owned and operated a wholesale beer distribution business in the Minneapolis-St. Paul area.

would include any amount the purchaser paid for Mr. Langdon's covenant not to compete and/or consulting agreement.[5]

Pohle Partners subsequently appraised BDC at almost $2 million.

Minutes of the annual meeting of BDC's board of directors on April 18, 1991, reflect the following:

> The president [Mr. Langdon] reported that Pohle Partners have approximately ten firms interested in acquiring Bemidji Distributing Company. An appraisal of the sale value of Bemidji Distributing Company has been made by Pohle Partners and it is in the neighborhood of two million dollars. The president feels that an offer to prospective buyers of the amount of the appraisal is satisfactory and has accepted the figure.

An information package was prepared by Pohle Partners for potential purchasers. With respect to the nature of business and franchise and territorial protections, the package states:

> This is an opportunity to acquire a prosperous beer distribution business in a broadly based, progressive market with the brands of the second largest national brewer, Miller Brewing Company, which together with products of other suppliers, provides excellent brand diversification.

> > *       *       *       *       *       *       *

---

[5]In its letter dated July 19, 1990, to Mr. Langdon, Pohle Partners enclosed the following fee schedule:

| Purchase Price | | Fee |
|---|---|---|
| Over | But Not Over | |
| * | * * * | * * * |
| 1,000,000 | 2,000,000 | $50,000, plus 4 percent of excess over $1,000,000 |
| 2,000,000 | 3,000,000 | $90,000, plus 3 percent of excess over $2,000,000 |

Franchise and Territory Protection: BDC has agreements with its suppliers providing certain rights to the wholesaler in its relationship with the supplier and granting exclusive territories which is supported by a strong state beer franchise law.

Regarding the nature of sale, price, and terms, the package states:

VIII.
Nature of Sale, Price and Terms
Assets Purchased from BDC and Owner, Individually

Nature of Sale

Sale of certain corporate assets which are within the general categories set forth below and a covenant not to compete and a consulting agreement from the owner individually.

Price

| Asset | Price | |
|---|---|---|
| Accounts Receivable | $60,000 | (1) |
| Inventories | 300,000 | (1) |
| Equipment | 105,000 | (2) |
| Warehouse and Land | 300,000 | |
| Intangibles | 1,200,000 | (3) |
| Total | 1,965,000 | |

Notes: (1) These are estimates; actual amounts will be determined at closing with inventory priced at current laid-in-costs, i.e., current supplier prices and freight charges and taxes.

(2) As these assets will likely change in the normal course of business, the purchase price will change accordingly.

(3) Intangibles amount to be allocated among company intangible assets (customer lists, franchise rights, goodwill, etc.) and agreements with owner.

Terms--Cash

On June 3 and 5, 1992, BDC, Mr. Langdon, and Bravo executed a purchase agreement to sell all BDC's assets for $2,017,461. The purchase agreement included the separate consulting agreement and covenant not to compete, signed by Mr. Langdon and Bravo. The principals of Bravo were from Hobbs, New Mexico. They had never lived in Minnesota and had no experience either in Bemidji or as beer distributors. In negotiations with Pohle Partners they insisted on both a consulting contract and a strong, enforceable covenant not to compete as conditions of the sale.

The purchase agreement allocated $817,461 to BDC's tangible operating assets and accounts receivable, $200,000 to a 2-year consulting agreement, and $1 million to a 5-year covenant not to compete between Mr. Langdon and Bravo. Nothing was allocated to any of BDC's intangible assets such as goodwill, going concern value, and exclusive distribution rights. The purchase agreement stated:

> D. Seller's Intangible Property: No additional consideration shall be due from Buyer to Seller for Seller's Intangible Property, such assets to be transferred from Seller to Buyer in consideration of the benefits to be derived by Seller under the remaining provisions of this Agreement.

Mr. Langdon did not negotiate with Bravo over the allocations. He knew that Bravo's offer to purchase was contingent upon the execution of a covenant not to compete, and accepted Bravo's proposal that full value for the intangibles be allocated to the consulting agreement and the covenant.

The sale of the business under the June 3 and 5, 1992, purchase agreement closed on or about October 30, 1992.

BDC incurred and deducted $107,815 for expenses of the sale transaction.

## C. Notices of Deficiency

In the notice of deficiency issued to BDC, respondent determined, among other things, that BDC failed to report $1.2 million of income received from Bravo.[6] Alternatively, if the allocations should be upheld, respondent determined that the selling expenses incurred by BDC were improperly allocated, and these expenses attributable to the consulting agreement and covenant (59.48 percent) are a constructive dividend to Mr. Langdon and not deductible by BDC.

The notice of deficiency issued to the Langdons was consistent, determining that 59.48 percent of selling expenses is a constructive dividend to Mr. Langdon.

Shortly before the trial in the instant cases, respondent conceded that Mr. Langdon's consulting agreement with Bravo had a value of $200,000. At trial and on brief, respondent conceded that the covenant had a value of $121,000.

---

[6]The Langdons reported and paid personal income tax on the $1.2 million, in keeping with the purchase agreement allocation.

OPINION

## Issue 1.  Fair Market Value of the Covenant Not To Compete Entered Into by Mr. Langdon and Bravo

The amounts of any tax deficiencies of the parties herein turn on the value of the covenant not to compete.  That is so because, as to BDC, the amount properly allocated to intangibles (in excess of basis) is taxable as capital gain.  When it is distributed to the shareholder (Mr. Langdon), it is treated as a nondeductible dividend and taxed again to him.  See secs. 61(a)(7), 11, 301(c)(1).

On the other hand, the amount allocated to the covenant will be taxed to the shareholder as ordinary income, but such amount will escape tax at the corporate level.  Thus, it is only taxed once, not twice.  The same applies to the consulting agreement. In other words, the consulting agreement and covenant, even though part of a total package, are treated as separate agreements between the buyer and shareholder, and the selling company is not taxed thereon.

The buyer's interests are not adverse.  It can ratably deduct the cost of the covenant not to compete over the life of the covenant--in this case 5 years.  See sec. 1.167(a)-3, Income Tax Regs.  So once again, the more that is allocated to the covenant, the greater the tax benefit to all parties.[7]

---

[7]Bravo, the buyer, was not before the Court.

Allocation rules are governed by section 1060, which generally mandates the use of the residual method of purchase price allocation as set forth in section 338(b)(5) and the accompanying regulations. Sec. 1.1060-1T(a)(1), Temporary Income Tax Regs., 53 Fed. Reg. 27039 (July 18, 1988).

However, as amended by the Omnibus Budget Reconciliation Act of 1990 (OBRA 1990), Pub. L. 101-508, sec. 11323(a), 104 Stat. 1388, 1388-464, section 1060(a) further provides:

> If in connection with an applicable asset acquisition, the transferee and transferor agree in writing as to the allocation of any consideration, or as to the fair market value of any of the assets, such agreement shall be binding on both the transferee and transferor unless the Secretary determines that such allocation (or fair market value) is not appropriate.

This amendment is generally effective for acquisitions made after October 9, 1990, and applies to these cases. OBRA 1990 sec. 11323(d), 104 Stat. 1388-465.

The legislative history concerning the above amendment to section 1060(a), among other things, provides, in pertinent part:

> The committee does not intend to restrict in any way the ability of the IRS to challenge the taxpayers' allocation to any asset or to challenge the taxpayers' determination of the fair market value of any asset by any appropriate method, particularly where there is a lack of adverse tax interests between the parties. [H. Rept. 101-881, at 351 (1990).]

As we have observed, there are no adverse tax interests between the parties here.[8]  We strictly scrutinize an allocation if it does not have adverse tax consequences for the parties; adverse tax interests deter allocations which lack economic reality. Wilkof v. Commissioner, 636 F.2d 1139 (6th Cir. 1981), affg. per curiam T.C. Memo. 1978-496; see also Lorvic Holdings, Inc. v. Commissioner, T.C. Memo. 1998-281 (and cases cited therein).

In Buffalo Tool & Die Manufacturing Co. v. Commissioner, 74 T.C. 441, 446-448 (1980), we noted that where the Commissioner challenges a contractual allocation (as in the cases at hand), two tests are applied by the courts.  In Buffalo Tool & Die Manufacturing Co., we stated:

> [Those tests are] whether (a) the contractual allocation has "some independent basis in fact or some arguable relationship with business reality such that reasonable [persons], genuinely concerned with their economic future, might bargain for such agreement," in which event, the allocation will generally be upheld (Schulz v. Commissioner, 294 F.2d at 55), or (b) the allocation by the buyer and the seller of a lump-sum purchase price is unrealistic, which neither the respondent nor this Court is bound to accept (Rodman v. Commissioner, 542 F.2d 845 (2d Cir. 1976), affg. on

---

[8]Prior to repeal of the preferential tax rate for capital gain in the Tax Reform Act of 1986 (TRA 1986), Pub. L. 99-514, 100 Stat. 2085, the grantor of a covenant not to compete had an incentive to minimize the amount paid for such a covenant because payments received in exchange therefor constituted ordinary income to the grantor, while the amount realized from the sale of other business assets might qualify for the preferential tax rate applied to net capital gain.  See Schulz v. Commissioner, 294 F.2d 52, 55 (9th Cir. 1961), affg. 34 T.C. 235 (1960).

this issue a Memorandum Opinion of this Court; F. & D. Rentals, Inc. v. Commissioner, 44 T.C. 335, 345 (1965), affd. 365 F.2d 34 (7th Cir. 1966)).

> In determining which test to apply herein, we first look to the circumstances under which the allocation * * * [was agreed to]. * * * [Id. at 447.]

Although respondent originally argued that neither the consulting agreement nor the covenant had economic reality, respondent now concedes that the consulting agreement was worth the $200,000 alotted to it, and that the covenant has economic reality to the extent of $121,000. Our task, then, is to establish the value of the covenant.

Relevant Factors

Courts have spelled out the relevant circumstances that must be considered in evaluating a covenant not to compete. These include: (a) The seller's (i.e., covenantor's) ability to compete; (b) the seller's intent to compete; (c) the seller's economic resources; (d) the potential damage to the buyer posed by the seller's competition; (e) the seller's business expertise in the industry; (f) the seller's contacts and relationships with customers, suppliers, and others in the business; (g) the buyer's interest in eliminating competition; (h) the duration and geographic scope of the covenant, and (i) the seller's intention to remain in the same geographic area. Lorvic Holdings, Inc. v. Commissioner, supra (and cases cited therein); see also Thompson v. Commissioner, T.C. Memo. 1997-287.

Petitioners rely on these factors to sustain the allocation. They did not offer an expert witness. Respondent did not discuss these factors, at trial or on brief, relying instead on the testimony of an expert witness, Nhoth Chouravong, to establish the value. Neither party offered any evidence as to the value of the other intangibles. We first apply the enumerated factors to the facts of these cases and then turn to Mr. Chouravong's report.

All the factors, with the possible exception of one, favor a substantial allocation to the covenant.

(a) The seller's ability to compete. Mr. Langdon certainly had the ability to compete. Neither his health nor his age was an impediment, and he was working at full throttle, continuing to expand the business when it was sold. Respondent argues that, because of existing exclusive distributorships, the only avenues open for petitioner were to start from scratch with specialty beers. But that is not correct: Mr. Langdon could have purchased Skaar, which was a business in place representing Pabst, or he could have gone to work for the Budweiser wholesaler.

(b) The seller's intent to compete. At the time of the sale, Mr. Langdon did not intend to compete. He believed it would be unethical to do so, especially during the 2 years of his consulting contract. However, he could have changed his mind.

Moreover, the existence of a consulting contract does not negate the need for a covenant: The purchaser could abrogate the contract for instance, or be terminated for cause. See <u>Peterson Mach. Tool, Inc. v. Commissioner</u>, 79 T.C. 72, 85 (1982) (holding that an employment contract of a covenantor for the duration of the covenant not to compete is entitled to some weight, but is not determinative).

Mr. Langdon's primary reason for selling was not to retire but to avoid negotiating with the union once again. Since no other distributor in his region was unionized, that factor would not have prevented him from reentering the business. Therefore, the factor of the seller's intention to compete may slightly favor respondent, but only slightly.

(c) <u>The seller's economic resources</u>. After the sale, Mr. Langdon had ample economic resources to either start from scratch or buy an existing business.

(d) <u>Potential damage to the buyer</u>. If Mr. Langdon had competed with Bravo, he could have greatly harmed the company. Because of his long personal friendships with customers, they certainly would have redirected a portion of their business to him. However, because of the limited brand names available from Skaar or Budweiser, it is probable that BDC's customers would have continued to purchase from Bravo as well. Mr. Langdon might also have been able to attract some of his former employees,

thereby weakening Bravo. Using the record and our best judgment, we find that Bravo would have lost about one-third of its business (from loss of sales and efficiency due to lost personnel) if Mr. Langdon had reentered the market.

(e) <u>The seller's business expertise in the industry</u>. Mr. Langdon had 46 years of experience with every phase of the beer distribution business and had built BDC to be the leading distributor in the region. His expertise cannot be doubted.

(f) <u>The seller's relationships with customers, suppliers, and others in the business</u>. Mr. Langdon had cultivated business and personal relationships with his customers and suppliers over many years. It is reasonable to assume they would have been loyal to him.

(g) <u>The buyer's interest in eliminating competition</u>. Bravo's need and desire to eliminate competition from Mr. Langdon were clear from the beginning of negotiations. Indeed, the sale was contingent on a strong covenant not to compete. As noted above, there were good reasons for this. Bravo might not have survived if Mr. Langdon had gone into competition with it.

(h) <u>The duration and geographic scope of the covenant</u>. Five years was a reasonable length of time to extend the covenant. Mr. Langdon would have been 76 years old by the time it expired and not likely to reenter the market after a 5-year hiatus. The geographic scope of the covenant was also

reasonable, being apparently limited to the places where BDC already had customers.

(i) <u>The seller's intention to remain in the same geographic area</u>. Mr. Langdon had lived in Bemidji all his life and intended to remain there. He was still living there at time of trial.

<u>Respondent's Expert</u>

Respondent submitted the expert witness report and testimony of Nhoth Chouravong to establish the value of Mr. Langdon's covenant not to compete.

Expert testimony may help the Court understand an area requiring specialized training, knowledge, or judgment. <u>Snyder v. Commissioner</u>, 93 T.C. 529, 534 (1989). We may be selective in deciding what part of an expert's testimony we accept. <u>Helvering v. Natl. Grocery Co.</u>, 304 U.S. 282, 295 (1938); <u>Silverman v. Commissioner</u>, 538 F.2d 927, 933 (2d Cir. 1976), affg. T.C. Memo. 1974-285; <u>Parker v. Commissioner</u>, 86 T.C. 547, 561 (1986).

Mr. Chouravong is employed as a general and industrial engineer with the IRS and has valued closely held businesses and various types of tangible (real and personal) and intangible property. He has a B.S. degree in industrial engineering and an M.B.A. with a major in finance.

However, only 20 percent of Mr. Chouravong's actual job duties involves doing valuations. He is not certified by any professional organization. He has never valued a beer

distributorship, although he has valued three covenants not to compete in other businesses over the past 5 years. He did not interview Mr. Langdon nor anyone associated with the business.

Mr. Chouravong opined that the fair market value of the covenant was $121,000, based upon a number of assumptions of dubious validity. He assumed, for instance, a growth in the business of 2.7 percent per year, "based on the average growth rate from 1988 through 1991". We cannot verify this figure since he does not identify the source of this information and no documents demonstrating this were attached to the report or are otherwise in the record. We do know, however, that for the 2 most recent (and relevant) fiscal years, those ending February 28, 1991, and February 29, 1992, the rate of growth was 9.19 percent (from $197,923 to $215,236).

Mr. Chouvarong then piled discounts upon discounts. Beginning with a potential net income of $217,700, he seems to have assumed a potential 50 percent loss of business if Mr. Langdon were to compete. He then halved this on the ground that Mr. Langdon would need 6 months of startup time, an assumption that would not apply under either of the most likely scenarios, buying an existing distributorship or going to work for one.

Further, Mr. Chouravong assumed only a 45 percent likelihood that Mr. Langdon would actually compete in the first year (with decreasing percentages in subsequent years). On the other hand,

if Mr. Langdon had begun to compete in year one, it seems to us equally reasonable to <u>increase</u> the amount of loss that Bravo would have experienced in the out years. See <u>Buckley v. Commissioner</u>, T.C. Memo. 1994-470. Mr. Chouravong's assumption that Mr. Langdon would not compete was based upon four additional assumptions. Two are not supported at all by the record, and the others are on shaky ground: (1) That Mr. Langdon would not compete because he wanted to be free of the union; however, none of the other distributorships were unionized, so this was clearly not a deterrent. (2) That Mr. Langdon would have to work with only microbreweries, which was not true. (3) That the consulting agreement would be a deterrent. We agree that it would have some effect but, for reasons stated above, it is not determinative. (4) That Mr. Langdon's age, time in business, and personal reasons would deter him. Although one might suppose that a 71-year-old person would want to retire, Mr. Langdon did not cite that as a consideration in his testimony, which we found to be credible. It is equally reasonable to believe that Mr. Langdon's lengthy time in business might cause him to want to continue, since he was obviously continuing to build and enjoy the business at time of sale.

The "other personal reasons" presumably refers to the lack of a male heir. Mr. Langdon did not name that as a reason, and, in any event, it would not deter him from going to work for

another distributor or from taking over a business that his daughters could sell at his death. In short, we are persuaded that the likelihood (and certainly the ability) of Mr. Langdon's reentering the business should not be discounted.

Mr. Chouravong also applied an additional 24.2-percent discount on the basis of various cumulative "risk" factors. We cannot discern a risk factor in a covenant not to compete, other than that the covenant will be violated. However, the covenant provided for remedies in the case of breach, including injunctive relief and money damages. The entire value of the covenant was paid "up front". A covenant is not like an investment on which a return is earned over time. The only return bargained for is the grantor's forbearance. If Mr. Langdon died before the 5 years expired, he would still be unable to compete. A discount for risk thus also seems inappropriate.

It may be that Mr. Chouravong was attempting to derive the present value of BDC's operating profits for the life of the covenant as an outer limit to the value of the covenant. See Buckley v. Commissioner, supra. If so, however, he has failed to persuade us of an appropriate discount rate, and we decline to invent one out of whole cloth.

On the other hand, we agree with respondent that (1) the allocation of $1 million by the purchase agreement to the covenant was not the result of arm's-length bargaining, and (2)

BDC, Mr. Langdon, and Bravo, in agreeing to this allocation, did not have competing tax interests.  Mr. Langdon, through Pohle Partners, was well aware of the potential tax advantages to both buyer and seller of allocating the entire $1 million to the covenant.[9]

We also agree that it was unreasonable to have allocated nothing to goodwill and going-concern value, including the value of the distributorships.  In its appraisal of BDC's business, Pohle Partners concluded that the intangible assets (its customer lists, franchise rights, goodwill, etc.), together with the consulting agreement and covenant, were worth a combined $1.2 million.  The record reflects that the intangible assets had substantial value.

Neither party presented evidence as to the value of the intangibles.  The fact that the goodwill, or the value of the company, as a going concern, was not mentioned in the contract of

---

[9]Pohle Partners provided to Mr. Langdon a 1988 article entitled "Acquisition in Today's Beer World".  In that article, after mentioning the TRA 1986 changes discussed supra note 8, the Pohles discuss the use of allocations to covenants not to compete to alleviate potentially, in part, the effect of those tax law changes, where the wholesale beer business of a closely held, regular C corporation is being sold.  The article notes that these covenants will typically be with the individual shareholders who own the corporation selling the business, and further states:  "In an asset sale, there is not a tax affect within the [selling] corporation because the contracts are with the individuals * * *  Again, the purchaser is satisfied because of the deductability [over the life of the covenant of the payments made]".

purchase is not controlling.  Copperhead Coal Co. v. Commissioner, 272 F.2d 45, 48 (6th Cir. 1959), affg. T.C. Memo. 1958-9; Concord Control, Inc. v. Commissioner, 78 T.C. 742, 745 (1982).

> Goodwill exists where there is an "expectancy of both continuing excess earning capacity and also of competitive advantage or continued patronage."  Wilmot Fleming Engineering Co. v. Commissioner, 65 T.C. 847, 861 (1967).  More succinctly, it has been described as the probability that 'old customers will resort to the old place.'  Metallics Recycling Co. v. Commissioner, 79 T.C. 730 (1982); Brooks v. Commissioner, 36 T.C. 1128, 1133 (1961); see also Miller v. Commissioner, 56 T.C. 636, 649 (1971).  The indicia of goodwill are numerous and include practically every imaginable trait that has a positive bearing on earnings.

Solitron Devices, Inc. v. Commissioner, 80 T.C. 1, 18 (1983), affd. without published opinion 744 F.2d 95 (11th Cir. 1984).  There frequently is an overlap between the goodwill and going-concern value of a business.  Id. at 20.  Going-concern value has been defined as "the additional element of value which attaches to property by reason of its existence as an integral part of a going concern", and that such value is manifested by the ability of the acquired business to continue generating sales without interruption during and after acquisition.  Id. at 19-20; Concord Control, Inc. v. Commissioner, supra at 746; VGS Corp. v. Commissioner, 68 T.C. 563, 592 (1977).

In the instant cases, Bravo acquired an established and profitable wholesale beer and beverage distribution business with a workforce in place.  The buyer had no startup expenses.  In

addition to acquiring all the real estate and tangible personal property that BDC used in that business, Bravo acquired BDC's customer lists and exclusive brand and distribution rights in the market area the business served. We find that substantial goodwill and going-concern value was transferred by BDC.

Petitioners cite cases upholding large allocations to covenants. These cases all predate the TRA 1986, and thus, unlike here, involved parties with competing tax interests. See Intl. Multifoods Corp. v. Commissioner, 108 T.C. 25, 46 (1997) (cases upholding the contracting parties' allocation of a specific amount to a covenant not to compete are premised upon the assumption that the competing tax interests of the parties will ensure that the allocation is the result of arm's-length bargaining; where that assumption is unwarranted, there is no reason to be bound to the allocation in the contract); Buffalo Tool & Die Manufacturing Co. v. Commissioner, 74 T.C. at 446-448; see also H. Rept. 101-881, at 351 (1990). The cases on which petitioners rely are innapposite.

We reject respondent's proposed valuation of $121,000 as unrealistically low and built upon faulty assumptions. Petitioners, who did not offer an expert, have calculated, based upon different discount rates and assumptions, that the covenant is worth $2,247,992. This is totally unrealistic, inasmuch as it exceeds the entire purchase price of the business. We therefore

will use our best judgment, based upon the record, sketchy as it may be.

> An allocation to a covenant not to compete lacks economic reality where there is no showing that the seller would experience a loss comparable to the amount supposedly paid for the covenant such that it would bargain for substitute compensation in that amount or that the buyer would lose such an amount were the seller to compete against it.  [Buckley v. Commissioner, T.C. Memo. 1994-470 (citing Forward Communications Corp. v. United States, 221 Ct. Cl. 582, 608 F.2d 485, 493-494 (1979).]

Income projected to be earned over the next 5 years, without discounts or increases (or taking into account optional or one-time items), is $1,075,000 ($215,000 x 5).  This is perhaps the maximum amount Bravo could lose, if Mr. Langdon competed and drove it completely out of business.  Mr. Langdon's potential loss of income, of course, is considerably more: $1,075,000 plus his $90,000 salary per annum for 5 years, minus the $200,000 consulting contract, or $1,325,000, if he took all the corporate earnings as dividends.

Both scenarios are highly unlikely.  We believe that, if he competed, Mr. Langdon would not take away more than one-third of BDC's business, because he would be unable to sell his former products, and BDC would retain some customers through their brand loyalty.  We are also mindful that, while Bravo might not survive without the covenant not to compete, neither would it survive without employees, distributors, or customers.  Therefore, we find that the covenant not to compete has a fair market value of

$334,000, and that the remaining $666,000 of the $1 million in issue represents the other intangibles.

## Constructive Dividend

A constructive dividend occurs where a corporation has conferred an economic benefit on the shareholder in order to distribute available earnings and profits without expectation of repayment. See Truesdell v. Commissioner, 89 T.C. 1280, 1295 (1987). We hold that the additional $666,000 properly allocable to intangibles was nondeductible capital gain income to BDC that was then distributed to Mr. Langdon as ordinary dividend income.[10]

## Issue 2. Constructive Dividend Received by Mr. Langdon From BDC for Expenses Paid To Obtain the Consulting Agreement and the Covenant Not To Compete

BDC incurred and deducted $107,815 for expenses of the sale of its assets. In the notices of deficiency, respondent determined that $60,581.39 of the selling expenses was allocable to Mr. Langdon's consulting agreement and covenant and, thus, taxable to him as a constructive dividend, not deductible by BDC. On brief, respondent acknowledges that BDC is entitled to deduct those selling expenses that are not allocable to Mr. Langdon's consulting agreement and covenant, and agrees that only the pro rata portion of the expenses allocable to the consulting

---

[10]Neither party argued that BDC did not have sufficient earnings and profits for dividend treatment.

agreement and covenant should be treated as a constructive dividend to Mr. Langdon.

In determining whether an expenditure by a corporation represents a constructive dividend to the shareholder, it is also necessary to decide whether the expenditure primarily benefited the shareholder personally rather than furthered the interest of the corporation. Hagaman v. Commissioner, 958 F.2d 684, 690-691 (6th Cir. 1992), affg. on this issue T.C. Memo. 1987-549; Ireland v. United States, 621 F.2d 731, 735 (5th Cir. 1980); see also Loftin & Woodard, Inc. v. United States, 577 F.2d 1206, 1214 (5th Cir. 1978); Hood v. Commissioner, 115 T.C. 172, 179-180 (2000)

Where the expenses are those of the shareholder, the showing a corporation must make to deduct those expenses is a strong one. To avoid constructive dividend treatment, the taxpayer must show that the corporation primarily benefited from the payment of the shareholder's expenses. Hood v. Commissioner, supra at 181.

In the instant cases, BDC did not require Mr. Langdon to pay his pro rata share of the transaction's selling expenses. Mr. Langdon received $200,000 for his consulting agreement and $334,000 for the covenant, or a total of $534,000 of the $2,017,461 total purchase price. Petitioners have not addressed this issue, either at trial or on brief; we thus deem the issue waived. We hold that BDC's payment of the selling expenses allocable to Mr. Langdon's consulting agreement and covenant

primarily benefited him and not BDC.  Accordingly, the pro rata share of the selling expenses attributable to Mr. Langdon and paid by BDC is a constructive dividend taxable to him and nondeductible by BDC.

To reflect respondent's concessions and the foregoing,

<u>Decisions will be entered</u>

<u>under Rule 155.</u>